**Deborah K. WALTON, Plaintiff–Appellant,**

v.

**COMMISSIONER OF SOCIAL SECURITY, Defendant–Appellee.**

No. 01–2135.

United States Court of Appeals, Sixth Circuit.

April 11, 2003.

Before BOGGS, SUHRHEINRICH, and CLAY, Circuit Judges.

CLAY, Circuit Judge.

Plaintiff, Deborah K. Walton, appeals from the district court's order granting

summary judgment to Defendant, the Commissioner of Social Security ("the Commissioner"), on Plaintiff's claim filed pursuant to 42 U.S.C. § 405(g) challenging the final decision of the Commissioner denying Plaintiff social security disability benefits under Title 42 of the Social Security Act. 42 U.S.C. § 423(d). For the reasons set forth below, we AFFIRM the district court's judgment.

## BACKGROUND

### Procedural History

Plaintiff applied for Social Security disability benefits on August 7, 1997, alleging disability since July 7, 1996, due to low back and left knee pain. After Plaintiff's application was denied initially and upon reconsideration. Plaintiff appeared with counsel at a hearing held on July 8, 1999 before an administrative law judge ("ALJ"). At the hearing, Judith Findora testified as a vocational expert ("VE"). On September 22, 1999, the ALJ found that Plaintiff was not disabled under the Social Security Act since Plaintiff retained the ability to perform a significant number of unskilled sedentary jobs. The appeals council denied review on July 17, 2000 and the ALJ's decision became the final decision of the Commissioner.

Pursuant to 42 U.S.C. § 405(g), Plaintiff sought judicial review of Commissioner's final decision by a civil action in the United States District Court for the Eastern District of Michigan. On February 22, 2001, a magistrate judge issued a recommended decision affirming the Commissioner's decision to deny Plaintiff's application for Social Security disability benefits. On March 15, 2001, Plaintiff filed objections to the magistrate judge's report and recommendation. On March 21, 2001, the district court accepted the magistrate judge's report and recommendation and granted the Commissioner's motion for summary judgment.

On August 6, 2001, Plaintiff timely filed a notice of appeal.

### Facts

A. Medical Evidence

1. Knee Condition

On July 7, 1996, Plaintiff was in an automobile accident injuring her left knee. Plaintiff was seen by Norman E. Walter, M.D., an orthopedic surgeon. Dr. Walter noted evidence of low grade internal derangement of the left knee. On November 5, 1996, Plaintiff underwent a left knee arthroscopy. On November 18, 1996, Dr. Walter noted that there were no complications from the surgery, the incision looked good, and Plaintiff was doing well. He also ordered her to continue her range of motion exercises.

Plaintiff was seen by R. Benton, D.O., Plaintiff's treating physician, on November 25, 1996. Dr. Benton noted that the left knee was swollen and stiff, and that Plaintiff was unable to flex it greater than sixty degrees. On December 9, 1996, Dr. Benton noted that the left knee was bothering Plaintiff due to the physical therapy she was receiving for her back problem. On January 13, 1997, Dr. Benton ordered a transcutaneous electronic nerve stimulator ("TENS") unit for Plaintiff's back and knee problem. Also in January of 1997, Plaintiff told Dr. Walter that she expected to return to work in six to eight weeks. On February 10, 1997, Dr. Benton noted that Plaintiff's left knee was swollen and stiff, and that it was painful to extend. Plaintiff told Dr. Benton on February 20, 1997 that her left knee goes out while walking, especially when it is swollen. Plaintiff also stated that she was able to perform straight leg lifts on a treadmill

and use a bicycle for ten to fifteen minute periods.

Dr. Walter examined Plaintiff again on March 6, 1997, noting that she complained of pain and weakness in her left knee and that she was using a cane to walk. Dr. Walter found some "point tenderness" in the left knee area, but questioned in his notes whether her pain was real or not.

On March 10, 1997, Dr. Benton noted that Dr. Walter scheduled Plaintiff for further testing on her left knee. Dr. Benton also noted that Dr. Walter had told him that Plaintiff would have to "put up with" the knee condition because the surgery on the knee only maintains the status quo. Dr. Walter reported to Dr. Benton that Plaintiff would get no further benefit from medical treatment until fifteen years from now when she would be eligible for a knee replacement. Finally. Dr. Walter emphasized that Plaintiff was not to work, kneel, or walk for exercise.

Plaintiff was seen again by Dr. Walter on April 3, 1997, at which time he found minimal strength deficits using Cybex evaluations. Plaintiff complained of a lot of tenderness after her surgery. Dr. Walter noted that there was no surgical lesion he could think of that would cause her continued difficulties. Giving Plaintiff the benefit of the doubt, Dr. Walter determined that Plaintiff should stay off work until August of 1997, unless her activities were limited to no climbing, squatting, or heavy lifting.

On April 3, 1997, Plaintiff began physical therapy for her left knee; however, on April 21, 1997, Dr. Benton noted that the physical therapy should be discontinued due to the swelling and pain in Plaintiff's left knee. Dr. Benton applied ice to stop the swelling, noted that Plaintiff was walking with a cane, and that Dr. Walter had discussed the possibility of a knee brace.

Dr. Benton saw Plaintiff on May 5, 1997 and recorded her employment restrictions as follows: "No bending, climbing, lifting over five pounds, squatting or kneeling due to acute derangement of left knee and complications thereof [including] right lumbar muscle spasms due to inability to ambulate normally." (Tr. at 178.) On June 2, 1997, Plaintiff saw Dr. Benton complaining of "shooting plain" in her left knee and stiffness. (Tr. at 179.) Dr. Benton also noted that physical therapy would not help her left knee and that exercises could be done at home.

The last recorded visit with Dr. Walter occurred on June 16, 1997, at which time Plaintiff continued to complain of pain in her left knee. Dr. Walter recorded his objective medical findings as "nil." (Tr. at 138.) Dr. Walter noted that he had no further treatment to offer Plaintiff and would see her as needed.

Dr. Benton saw Plaintiff on July 1, 1997 and observed swelling in the left knee tissue. On August 21, 1997, Plaintiff told Dr. Benton that the new treatment on the left knee caused considerable pain and that she was "losing thigh muscle." (Tr. at 181.) Dr. Benton also noted that Plaintiff walked on a treadmill at three-to-four miles per hour for thirty minutes with the assistance of a cane and knee brace. On September 23, 1997, Dr. Benton noted that Plaintiff worked out at home with weights and used a TENS unit. Although Dr. Benton did not record any objective medical findings, he extended Plaintiff's sick leave and physical therapy.

Dr. Benton was contacted by the Disability Determination Services ("DDS") on September 29, 1997. He reported to the DDS that Plaintiff complained of pain and swelling in both knees; however, the left knee was worse than the right knee. Dr. Benton also reported that Plaintiff had hypertension, moderated to severe restric-

tion of motion in her knees and walked with a limp. There are no records of Plaintiff visiting Dr. Benton after September of 1997.

On November 22, 1997, Robert O'Shea, M.D., examined Plaintiff for the DDS. Plaintiff told Dr. O'Shea that she had been diagnosed with synovitis, tendinitis, and derangement of the left knee. Plaintiff also stated that traction, physical therapy, and a TENS unit did not relieve her pain. The pain had become so severe that she had to use a fentanyl patch.[1] Dr. O'Shea found that Plaintiff had mild difficulty squatting, kneeling, and walking. Dr. O'Shea also noted that Plaintiff walked with a cane and a small stepped gate. Dr. O'Shea found full range motion in all joints tested and no chronic arthritic changes, tenderness, erythema, or effusion.

On February 3, 1998, Dr. Benton restricted Plaintiff's work activities to lifting no more than five pounds. Plaintiff was also to avoid bending, squatting, kneeling, climbing, sitting up to one-half hour, and walking continuously for more than twenty to thirty minutes. Dr. Benton reported Plaintiff's continuing problems with her left knee.

On May 17, 1998, Dr. Benton replied to an inquiry by a vocational case manager from Concreta Managed Care, Inc., about Plaintiff's work restrictions, noting that Plaintiff could not sit or stand in one place longer than fifteen to twenty minutes. Dr. Benton also reported that Plaintiff's left knee became stiff when sitting too long and sore when standing too long. When the vocational case manager asked Dr. Benton if he believed Plaintiff would be able to perform either a receptionist, dispatcher, or clerk job, Dr. Benton respond-

ed that Plaintiff would not be suited for any type of gainful employment.

In a May 13, 1999 letter regarding a request for Plaintiff's disability determination, Dr. Benton reported that Plaintiff's major problem was her left knee, noting that Plaintiff's left knee remained swollen and stiff with limited motion in flexion and extension. Dr. Benton also reported that Plaintiff could not sit or stand over one-half hour due to pain intensity and stiffness.

Dr. Benton completed a form on May 28, 1999 in which he responded "no" to every question, denying that Plaintiff could lift even five pounds occasionally, walk for two hours, sit for six out of eight hours, squat, stoop, bend, twist, turn, or reach without difficulty. Dr. Benton also denied that Plaintiff had good use of both of her arms, shoulders, wrists, elbows, and hands.

### 2. Back Condition

After the July 1996 automobile accident that injured Plaintiff's knee, Dr. Benton noted that Plaintiff complained of backache. Dr. Benton found swelling and tenderness in Plaintiff's cervical spine, upper dorsal, and lumbar muscles. Plaintiff's cervical range of motion was limited to 70% to the left, 50% to the right, 30% extension, and 10% flexion. Dr. Benton prescribed a soft cervical collar and determined that Plaintiff was unable to work for two weeks.

On July 16, 1996, x-rays of Plaintiff's cervical spine and upper dorsal revealed minimal degenerative spurring. In August of 1996, Dr. Benton noted that Plaintiff continued to complain of lower back pain, multiple muscle spasms, tenderness, pain radiating to her left hip and leg, and

---

**1.** A fentanyl patch is described as "a transdermal system providing continuous systemic delivery of fentanyl, a potent opioid analge- sic...." *See* Physicians' Desk Reference 1298 (52d ed.1998).

an inability to perform basic housework due to the pain. In September of 1996, Plaintiff continued to report the same problems. Physical therapy was ordered for Plaintiff. Dr. Benton's September 9, 1996 examination of Plaintiff revealed swelling and stiffness of muscles on palpitation, a painful lumbar spine with muscle tenderness and swelling. The base of Plaintiff's neck and dorsal spine were fine.

In Dr. Benton's first contact with the DDS on September 29, 1997, he reported that Plaintiff complained of back pain in the lumbar area, discomfort, and tightness. During the months of November and December of 1996, Plaintiff continued to report the same problems. On December 17, 1996, Dr. Benton prescribed a TENS unit for Plaintiff's pain and diagnosed her with lumbar myostitis-spasms. In May of 1997, Dr. Benton noted pain, stiffness, tenderness, and swelling in Plaintiff's right lumber muscles. On May 5, 1997, Dr. Benton imposed work restrictions on Plaintiff for her knee and back problems.

As noted above, on November 22, 1997, Dr. O'Shea examined Plaintiff for the DDS. Plaintiff told Dr. O'Shea that she had extreme pain in the lower back, requiring use of a Fentanyl patch. Dr. O'Shea noted that Plaintiff had mild difficulty squatting, heeling, and walking. Moreover, there was no evidence of any nerve root irritation.

When Dr. Benton was contacted by the DDS for the second time on May 8, 1998, he reported that Plaintiff had multiple bilateral spasms in the low back and moderately restricted range of motion of the dorsolumbar spine. On May 17, 1998, in response to the vocational case manager, Dr. Benton attributed Plaintiff's low back instability to her knee pain. Dr. Benton described Plaintiff's back pain as "intolerable." In the May 13, 1999 letter, Dr. Benton also attributed Plaintiff's back

problems to her knee injury. As noted above, Dr. Benton stated in the letter that Plaintiff could not sit or stand over one-half hour. The work restrictions in the May 28, 1999 form also pertained to Plaintiff's back condition.

### 3. Blood Pressure

Plaintiff contends that her high blood pressure is an additional reason she cannot work.

### 4. Mitral Valve Prolapse

During Plaintiff's visit with Dr. O'Shea on November 22, 1997, Plaintiff reported that she had a history of mitral valve prolapse. Results of an electrocardiogram taken during the visit revealed nonspecific ST wave changes that were not diagnostic.

In the May 13, 1999 letter, Dr. Benton stated that mitral valve prolapse caused Plaintiff "sometimes frequent episodes of fleeting dizziness which is dangerous to the patient['s] physical stability." (Tr. at 187.)

### 5. Other Conditions

Dr. Benton's letter of May 13, 1999 discussed other conditions in addition to those discussed above, such as stress headaches, heel spurs, bronchitis, and partial hearing loss.

### B. Testimony at the Administrative Hearing

#### 1. Plaintiff's Testimony

At the administrative hearing on July 8, 1999, Plaintiff testified that she could not work because of derangement of her left knee due to an automobile accident, degenerative joint disease of her back, high blood pressure, and mitral valve prolapse. Plaintiff testified that she used a cane to walk short distances, could sit only for

twenty minutes, had difficulty bending her knee and could not squat or kneel.

Plaintiff initially testified that she could lift about five pounds. However, Plaintiff later testified that she could only lift a half gallon of milk and was not sure whether she could lift five pounds.[2] Plaintiff also testified that her mitral valve prolapse rendered her short of breath and dizzy, and that Dr. Benton told her she may need a valve replacement soon. Plaintiff further testified that her blood pressure was not under control.

Plaintiff indicated that her husband did all the housework and she spent her days sitting in a chair or lying down on the couch. Plaintiff did not drive, visit, or go out to lunch. Plaintiff also indicated that her medications made her tired, dizzy, and sick to her stomach.

### 2. Plaintiff's Husband's Testimony

Plaintiff's husband, Troy Walton, testified at the hearing. Mr. Walton confirmed Plaintiff's testimony.

### 3. Vocational Expert's Testimony

At the hearing the ALJ asked the VE about the availability of jobs for a hypothetical person who was the same age, and had the same education, past work experience, and physical limitations as Plaintiff. In response, the VE testified that numerous jobs existed in the local region that accommodated the hypothetical person's limitations such as 1,000 inspector jobs, 6,000 assembly jobs, 1,500 surveillance system monitor jobs, 800 security jobs, and 1,000 sorter jobs.

### DISCUSSION

We review the Commissioner's final decision pursuant to 42 U.S.C. § 405(g),

which specifies that the Commissioner's factual findings are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence means "more than a mere scintilla." *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524, 535 (6th Cir.1981) (quoting *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)). It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* In determining whether the Commissioner's factual findings are supported by substantial evidence, we must examine the evidence on the record "as a whole," *Allen v. Califano,* 613 F.2d 139, 145 (6th Cir.1980), and take into account whatever in the record fairly detracts from its weight. *Beavers v. Sec'y of Health, Educ. & Welfare,* 577 F.2d 383, 387 (6th Cir.1978) (quoting *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951)). If the factual findings are supported by substantial evidence, the Commissioner's determination must stand regardless of whether we would resolve the issues of fact in dispute differently. *Kinsella v. Schweiker,* 708 F.2d 1058, 1059 (6th Cir.1983).

### A. Treating Physician's Opinion

Plaintiff argues that the ALJ failed to give proper deference to the opinion of the treating physician, Dr. Benton. Plaintiff relies on Dr. Benton's May 28, 1999 opinion that Plaintiff could not work because she could not lift five pounds, walk for two hours, sit for six out of eight hours, squat, stoop, bend, twist, turn, or reach without difficulty. Plaintiff argues that Dr. Benton's May 28, 1999 opinion should have been given complete deference since

---

**2.** In Plaintiff's motion for summary judgment, Plaintiff states that a one-half gallon of milk weighs four pounds according to the grocery market scale.

no substantial evidence on the record sufficiently contradicts the opinion.

The Commissioner argues that the ALJ fully evaluated Dr. Benton's May 28, 1999 opinion and reasonably concluded that it was (1) inconsistent with Dr. Benton's earlier opinions that Plaintiff could do a restricted range of unskilled sedentary work, (2) unsupported by objective medical findings, and (3) inconsistent with other medical evidence on the record.

The Social Security Act defines disability as the inability to engage in any substantial gainful activity by reason of a medical determinable physical or mental impairment which can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). To determine whether a claimant is disabled, the ALJ employs a five-step inquiry. *Bowen v. Yuckert,* 482 U.S. 137, 140, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987); 20 C.F.R. § 416.920. If the ALJ makes a dispositive finding at any step, the ALJ does not review further. 20 C.F.R. § 404.1520(a). Through step three, the claimant bears the burden of proving the existence and severity of any functional limitations caused by her impairments. *Bowen,* 482 U.S. at 146 n. 5, 107 S.Ct. 2287. Step four requires the claimant to prove that her impairments preclude her from performing past relevant work. *Id.* At step five of the sequential evaluation process, the burden shifts to the Commissioner to prove that the claimant can perform other work which exists in the national economy. *Id.* Only the fifth step, whether Plaintiff can perform other work which exists in the national economy, is at issue in this case.[3]

In *Hall v. Bowen,* 837 F.2d 272, 276 (6th Cir.1988), we held that the ALJ properly rejected the treating physician's later opinion because it was inconsistent with his earlier opinion and unsupported by new findings of significant changes in the plaintiff's overall condition. The plaintiff's treating physician in *Hall* stated in a report dated January 22, 1985, that the plaintiff could not perform light or sedentary work. *Id.* The ALJ found that this opinion was inconsistent with the treating physician's earlier opinion because the physician had reported no significant changes in the plaintiff's overall condition between the dates of the reports. *Id.* Relying on the testimony of a vocational expert and a non-treating physician, the ALJ held that the plaintiff was not disabled within the meaning of the Social Security Act since a significant number of jobs existed in the national economy, which the plaintiff could perform after suffering a work-related back injury. *Id.* at 275. We reasoned that the non-treating physician's opinion and the treating physician's earlier opinion that the plaintiff could perform unskilled sedentary jobs provided substantial evidence on the record that the plaintiff was not disabled. *Id.* at 276.

Like the treating physician's opinion in *Hall,* Dr. Benton's May 17, 1998 and May 28, 1999 opinions are inconsistent with his earlier opinions. On May 5, 1997 and February 3, 1998, Dr. Benton opined that Plaintiff could work as long as her work activities were restricted. In particular. Dr. Benton's February 3, 1998 opinion restricted Plaintiff's work activities to lifting no more than five pounds and avoiding bending, squatting, kneeling, climbing, sitting up to one-half hour, and walking continuously for more than twenty-to-thirty minutes. However. On May 17, 1998.

---

**3.** The ALJ accepted the VE's determination that Plaintiff could not perform her past relevant work of school custodian.

Dr. Benton reported to a vocational case manager that Plaintiff would not be suited for any type of gainful employment, and reiterated this opinion on May 28, 1999.

Although Dr. Benton's May 17, 1998 opinion is consistent with his May 28, 1999 opinion, on the record before us the ALJ properly rejected these opinions since they were not supported by new findings of significant changes in Plaintiff's overall condition inasmuch as Dr. Benton had not observed Plaintiff for approximately eight months prior to May 17, 1998. There are no records of Plaintiff visiting Dr. Benton after September of 1997. *See Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 118 (6th Cir.1994).

This conclusion is supported by *Stanley v. Secretary of Health & Human Services. Id.* The treating physician in *Stanley* originally opined that the plaintiff could perform a range of unskilled sedentary work, but then later opined that the plaintiff was unable to perform any work in the national economy. *Id.* The ALJ refused to consider the later opinion, however, and found that the plaintiff was not disabled. *Id.* On appeal, we held that the ALJ properly rejected the treating physician's later opinion that the plaintiff could not work since the treating physician did not provide any objective medical findings to support his change of opinion. *Id.* We reasoned that there was no objective medical findings on the record that indicated that the plaintiff was in continuous disabling pain. *Id.*

Like the treating physician in *Stanley*, Dr. Benton did not provide any objective medical findings to support his May 17, 1998 and May 28, 1999 opinions. Dr. Benton expressed his May 28, 1999 opinion by completing a form in which he responded "no" to every question, thus denying that Plaintiff could work with certain restrictions. Dr. Benton offered no explanation why he changed his February 3, 1998 opinion that Plaintiff could perform a range of unskilled sedentary work. Also, there are no office notes after September of 1997 indicating any new objective medical findings after that date to support Dr. Benton's May 17, 1998 and May 28, 1999 opinions. In reporting his later opinions, Dr. Benton apparently relied on the subjective complaints of Plaintiff inasmuch as the record indicates that Dr. Benton had not seen Plaintiff since September of 1997. Because subjective complaints do not constitute objective medical findings, *Young v. Sec'y of Health & Human Servs.*, 925 F.2d 146, 151 (6th Cir.1990), nothing on the record supports Dr. Benton's later opinions, and we therefore defer to the ALJ's assessment of Dr. Benton's opinion. *Blacha v. Sec'y of Health & Human Servs.*, 927 F.2d 228, 230–31 (6th Cir.1990).

Plaintiff argues that the Telephone Report of Contact, the Vocational Rehabilitation Report, and the Genesys Group Practice Letter Report contain objective medical findings and, therefore, should be incorporated by reference into the underlying data supporting Dr. Benton's May 28, 1999 opinion. We disagree. These reports are dated between September 27, 1997 and May 13, 1999. Since Plaintiff's last noted visit with Dr. Benton occurred in September of 1997, the reports are based on Dr. Benton's prior observations. Dr. Benton's prior observations cannot serve as a basis for his later opinions that Plaintiff could not work since his prior observations indicate that Plaintiff could work with certain restrictions. This is particularly so inasmuch as nowhere in the reports is Dr. Benton quoted as saying Plaintiff's condition will likely worsen to such a state that she will not be able to work. Thus, the reports do not support Dr. Benton's May 17, 1998 opinion nor his May 28, 1999 opinion.

Furthermore, Dr. Benton's May 17, 1998 and May 28, 1999 opinions are inconsistent with other medical evidence on the record. On November 22, 1997, Dr. O'Shea examined Plaintiff and reported that Plaintiff (1) had only mild difficulty squatting, kneeling, and walking, (2) had full range motion in all joints tested, and (3) suffered no chronic arthritic changes, tenderness, erythema, or effusion. Since nothing on the record illustrates that the ALJ gave Dr. O'Shea's opinion more weight than Dr. Benton's opinions, the ALJ properly considered Dr. O'Shea's opinion. *See Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 536 (6th Cir.1981) (holding that the opinions of a treating physician are entitled to more weight than the opinions of a non-treating physician).

B.   Plaintiff's Credibility

█   Plaintiff argues that the ALJ did not apply correct legal standards when assessing her credibility. In particular, Plaintiff argues that the ALJ's failure to find her credible as to her claim that she could not perform a restricted range of unskilled sedentary work is contrary to substantial evidence on the record. Plaintiff thus contends that the ALJ should have relied on the VE's testimony that no jobs would accommodate Plaintiff's capabilities if he assumed her subjective complaints were completely credible.

The Commissioner argues that the ALJ's Residual Functional Capacity ("RFC") determination was not inconsistent with Plaintiff's own varying statements about her limitations. The Commissioner also argues that the ALJ applied the correct legal standards when he rejected Plaintiff's credibility to the extent that she could not perform a limited range of sedentary work. We agree.

In *Townsend v. Secretary of Health & Human Services*, 762 F.2d 40, 44 (6th Cir.

1985), we held that subjective testimony of pain must be considered along with objective medical findings and expert medical opinions. However, we explained that the subjective testimony need not be fully credited. *Id.*

In this case, the ALJ took into consideration Plaintiff's statements that she could sit only for twenty minutes, walk only short distances, and occasionally lift up to five pounds when making the RFC determination. Consistently, the ALJ found that Plaintiff needed a sit-stand option, could not sit for more than twenty or thirty minutes a day, and could occasionally lift up to five pounds. Since the ALJ evaluated the record as a whole when assessing Plaintiff's credibility, the ALJ applied the correct legal standards. *See Id.* Thus, the ALJ was not obligated to rely on the VE's testimony that was given in response to a hypothetical question that was based on Plaintiff's credibility. Rather, the ALJ properly relied on the VE's response to a hypothetical question that was based on the limitations that were credited by the ALJ and supported by substantial evidence on the record. *See Blacha*, 927 F.2d at 231 (holding that if the hypothetical question is supported by substantial evidence on the record, it need not reflect a claimant's unsubstantiated complaints).

C.   Findings of Fact

Plaintiff argues that the magistrate judge, like the ALJ, misconstrued findings of fact. Plaintiff argues that the magistrate judge misstated the truth when he stated that (1) Dr. Benton's May 28, 1999 opinion was apparently based on Plaintiff's subjective complaints, (2) Plaintiff could walk on a treadmill, and (3) Plaintiff was prescribed a TENS unit until January 13, 1997. Because of these alleged misstatements, Plaintiff argues that the ALJ's de-

cision was not supported by substantial evidence. We disagree.

The magistrate judge did not make erroneous findings of fact. It was reasonable for the magistrate judge to infer that Dr. Benton's May 28, 1999 opinion was based on Plaintiff's subjective complaints since the opinion was unsupported by objective medical findings. Also, the magistrate judge properly found that Plaintiff could walk on a treadmill since Dr. Benton noted on July 1, 1997 that Plaintiff walked on a treadmill at three-to-four miles-per-hour for thirty minutes with the assistance of a cane and knee brace. Furthermore, even if the magistrate judge improperly found that Plaintiff was not prescribed a TENS unit until January 13, 1997, such finding is not dispositive of the issue at hand-whether substantial evidence on the record supports the ALJ's decision.

## CONCLUSION

For the foregoing reasons, the district court's order is AFFIRMED.