NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 14a0780n.06

No. 13-4360

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Oct 14, 2014
DEBORAH S. HUNT, Clerk

RONNIE KEETON,

       Plaintiff-Appellant,

v.

COMMISSIONER OF SOCIAL
SECURITY,

       Defendant-Appellee.

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF OHIO

BEFORE:     SILER, CLAY, and GIBBONS, Circuit Judges.

**CLAY, Circuit Judge.** Following denials of his application for disability insurance benefits, Plaintiff Ronnie D. Keeton appeared and testified at a hearing before an administrative law judge ("ALJ"), who denied Plaintiff's claim. Plaintiff appealed that decision to the United States District Court for the Southern District of Ohio. The district court affirmed the ALJ's decision, finding that Plaintiff was not disabled and not entitled to benefits under the Social Security Act, 42 U.S.C. § 301, *et seq.* For the reasons that follow, this Court **VACATES** the district court's determination that Plaintiff was not disabled and **REMANDS** to the Commissioner of Social Security (the "Commissioner") for further proceedings consistent with this opinion.

# I.

# BACKGROUND

## A.    Procedural History

Plaintiff filed an application for social security disability insurance benefits on December 21, 2007, alleging that his disability began on April 11, 2006.   The Social Security Administration (the "Administration") denied this application on February 8, 2008.   Upon reconsideration, the Administration again denied the application on August 14, 2008.  Following the second denial, Plaintiff submitted a written request for an administrative hearing, which was held on March 12, 2010.   Plaintiff and an impartial vocational expert testified at this hearing regarding Plaintiff's disabilities and employability.

In a decision dated July 28, 2010, the ALJ denied Plaintiff's application, finding that Plaintiff was not disabled and not entitled to benefits.   In this decision, the ALJ found that Plaintiff had not engaged in substantial gainful work during the period from April 11, 2006 through December 31, 2009, the date on which he last met the insured status requirements under the Social Security Act.  *See* 42 U.S.C. § 416(i)(3)(B).  The ALJ also found that Plaintiff suffers from three severe impairments in accordance with 20 C.F.R. § 404.1520(c): (1) residual effects of a myocardial infarction with stenting in 2000; (2) post-traumatic stress disorder ("PTSD"); and (3) depression.[1]  In accordance with 20 C.F.R. § 404.1520(d), the ALJ found that Plaintiff did not have an impairment that met or was medically equivalent to any of the impairments listed in 20 C.F.R. Part 404.  After considering the entire record, the ALJ found that Plaintiff had no more than mild limitation in his ability to perform activities of daily living, mild limitation in his

---

[1]Although Plaintiff alleged that he has severe impairments due to diabetes mellitus II and hypertension, the ALJ found that those conditions were sufficiently controlled by medication and did not constitute severe impairments within the meaning of the Social Security Act.

ability to maintain social functioning, and moderate limitation with respect to concentration, persistence, or pace. The ALJ found that Plaintiff had a residual functional capacity ("RFC") to perform medium work with additional limitations including unskilled low stress work, no assembly line production quotas, and work that is not fast-paced. Finally, after finding that Plaintiff could not perform any past relevant work, the ALJ posed a hypothetical question to a vocational expert and found that a substantial number of jobs in the national economy could be performed by Plaintiff. Thus, the ALJ concluded, Plaintiff was not entitled to benefits. The Administration's Appeals Council denied review of this decision.

Subsequently, Plaintiff filed a complaint in district court on July 12, 2012, pursuant to 42 U.S.C. § 405(g). On June 14, 2013, a magistrate judge issued a report and recommendation, recommending reversal of the ALJ's non-disability determination and the immediate award of disability benefits to Plaintiff. The Commissioner objected to the report and recommendation, and Plaintiff filed a reply to the objections. Taking those filings into account, the district court rejected the magistrate's report and recommendation and affirmed the ALJ's denial of benefits.

Plaintiff timely appealed the district court's decision.

**B.      Factual Background**

Plaintiff is a veteran who served as a Ninth Infantry division medic in Vietnam for two years. He was able to work for thirty years as a motor assembler and a training coordinator, although his PTSD symptoms and depression worsened during the latter part of that employment period.

Plaintiff resides in a single-story home with his wife of nearly forty years. In the recent past, Plaintiff experienced a number of mental and physical health problems. Plaintiff ultimately

took early retirement in 2004, based largely on what he claims was a decreased tolerance for stress.

### 1. Plaintiff's Hearing Testimony

Following discussion of his heart attack in 2000 and his diabetes, Plaintiff described his mental disabilities to the ALJ, frequently struggling to come up with the words necessary to describe his condition. He explained that although he was able to work for over thirty years, he began feeling more intense symptoms of PTSD following the second Gulf War. Plaintiff's PTSD symptoms were often exacerbated by difficult events in his life, including his father's Alzheimer's disease, the need to care for his father, and his father's death in 2009. Plaintiff testified that he experienced feelings of helplessness while caring for this father, similar to those he felt while treating wounded soldiers in Vietnam.

Plaintiff testified about a number of his symptoms that are well-documented in the record. He stated that he no longer sleeps well at night, often having nightmares about explosions during the war, which cause him to wake up feeling as though he had been at war once again. To reduce those feelings and to take the edge off of his nerves, he takes a number of medications, although he said they create fog-like conditions, making it difficult for him to focus. Plaintiff testified that he has trouble communicating with others, often struggling to find the proper words to express himself.

When Plaintiff attempted to describe the experiences during the war that he often relives in his dreams and that cause his depression, the ALJ cut him off and asked that he only describe the symptoms he presently suffers. He turned to explaining that he has panic attacks three to four times per week and that he often has auditory and visual hallucinations. When pressed about the auditory hallucinations, Plaintiff explained that he often hears "noise[s] that sound[]

like someone speaking." A.R. 59. These voices often ask him to come toward them, yet when Plaintiff turns toward the voices, he finds no one there. Plaintiff was also asked to describe his visual hallucinations and stated that he sees camouflaged soldiers at tree lines.

Much of the administrative hearing was spent reviewing Plaintiff's daily activities and his ability to care for himself and others. Plaintiff testified that he took care of his father as his father's Alzheimer's disease progressed from 2008 through 2009. He often bathed his father and even had his bathroom remodeled to better accommodate his father's medical needs.

Regarding daily activities, Plaintiff first explained that he only leaves his house once or twice per day and that he generally isolates himself at home with the lights off. He also explained that he has panic attacks three or four times per week. A few moments later, however, Plaintiff corrected this earlier statement, explaining that he actually leaves the house two or three times per day, often times to smoke outside. Every morning, Plaintiff walks or drives to a coffee shop three blocks away from his home and meets for approximately an hour with some of his veteran friends who are able to comfort one another. Plaintiff also testified that he occasionally does chores around the house such as running the vacuum cleaner, making the bed, and mowing the lawn. He occasionally goes shopping with his wife, but that generally consists of driving her to the store and waiting in the car or near the front of the store while she shops. Plaintiff also spends a considerable amount of time with his family, visiting his daughter and grandsons on a weekly basis and attending his grandson's sporting events.

Plaintiff also testified about his demeanor during the latter part of his over thirty years of employment. Toward the end of his employment, he frequently displayed outbursts of anger and missed work approximately two days per week due to stress. Despite these outbursts and

absences from work, however, Plaintiff never lost his job because, according to his testimony, "the union kept getting [his] job back." A.R. 53.

### 2. Medical Records and Medical Source Opinions

Since 2005, Plaintiff has received treatment from the U.S. Department of Veterans Affairs ("VA") for his PTSD and depression, and, according to most of the VA records, his symptoms were exacerbated while caring for his father and dealing with his father's death.

### a. Dr. Sanders

In May 2005, Plaintiff reported poor sleep due to bad dreams, survival guilt, and auditory and visual hallucinations. Three months later, Plaintiff met with VA staff psychiatrist Dr. Richard Sanders for an initial PTSD evaluation. During that appointment, Plaintiff described his tendency to get very angry and punch walls or doors, as well as nightmares and restless sleep, panic episodes, irritability, and feelings of worthlessness. In addition to taking background information, Sanders examined Plaintiff, noting that he had "rather slow spontaneous movement, some slowness of speech, and low volume of speech." A.R. 270. Additionally, Sanders noted that Plaintiff's thoughts centered on hopelessness and that his mood was depressed, often tearing. Sanders also observed that Plaintiff "was troubled by ambient noises in the hall and adjusted his seat so that he could keep an eye on the doorway." (*Id.*) Following this examination, Sanders diagnosed Plaintiff with "a clear case of combat-related PTSD," finding that the condition had "negative effects on work productivity, domestic relations, and quality of life." A.R. 271.

### b. Dr. Sehbi

Plaintiff also met with VA psychiatrist Dr. Darshan Sehbi on a few occasions in 2005, twice in 2006, once in 2007, and once in 2009. Throughout that period, even while occasionally acknowledging Plaintiff's better mood, Sehbi agreed with Plaintiff's PTSD diagnosis. Early on

in his reports, Sehbi documented Plaintiff's sluggishness caused by medication and noted that by November 10, 2005, Plaintiff's sluggishness had improved and that he felt comfortable with his medications. In October 2005, Sehbi assigned Plaintiff a Global Assessment of Functioning ("GAF") score of 48.[2]

Over time, Sehbi observed some minimal improvement in Plaintiff's mood. During an October 2005 appointment with Sehbi, Plaintiff was depressed and became tearful when asked to talk about his experiences during the war. However, according to reports from January and May 2006, Plaintiff was sleeping better and his mood and depression were improving. In 2007, Sehbi observed again that Plaintiff's mood was better, yet Sehbi still assigned a GAF score of 50 and kept Plaintiff on his medications. Throughout this time, however, Plaintiff continued to hear voices for brief moments. Sehbi's notes reflect Plaintiff's own reports that he got irritable and agitated from time to time during this period. On January 30, 2009, Plaintiff met with Sehbi for what appears from the record to be their last appointment together. During that appointment, Plaintiff indicated that he continued to have dreams and flashbacks and was growing increasingly depressed. Sehbi indicated in his notes that Plaintiff's mood was better, but increased Plaintiff's dosage of Celexa, one of his medications for symptoms of depression, insomnia, and paranoia.

### c.     Dr. Papadakis

On November 29, 2006, Plaintiff met with VA clinical psychologist Dr. Emanuel Papadakis, who conducted an evaluation to determine whether Plaintiff was unemployable and

---

[2]A GAF score "is a clinician's subjective rating, on a scale of zero to 100, of an individual's overall psychological functioning." *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 503 n. 7 (6th Cir. 2006). "A 41–50 reflects the assessor's opinion that the subject has serious symptoms *or* serious impairment of social or occupational functioning. Likewise, a 51–60 reflects the opinion that the subject has moderate symptoms *or* moderate impairment of social or occupational functioning." *Id*. at 511.

eligible for VA disability benefits. Papadakis first obtained background information from Plaintiff and then conducted his own examination of Plaintiff based on both his own observations and Plaintiff's reports. Papadakis observed that Plaintiff "[w]alked with severe disability [and] took very small steps." A.R. 237. Additionally, Papadakis observed that Plaintiff "was sloppily dressed and tearful. He cried a great deal. He reports crying about a friend who was killed in Vietnam." A.R. 237–38. During their appointment, Plaintiff "demonstrated above average levels of psychomotor agitation . . . was hypervigilant, suspicious, looked around the room and was tearful for about 80% of the time." A.R. 238. Plaintiff reported to Papadakis "that he [was] having nightmares, flashbacks, isolates at home, avoids other people, avoids listening to things that remind him of Vietnam. He reacts too much to things that remind him of Vietnam and he feels psychologically numb." A.R. 238. Additionally, Plaintiff complained about memory deficits and difficulties with concentration and attention. Based on each of these observations and reports, as well as Plaintiff's reported "difficulty with concentration, attention, and short term memory," Papadakis assigned Plaintiff a GAF score of 46 and concluded that Plaintiff was disabled and entitled to VA disability benefits. A.R. 238.

### d. Mr. Hugger

Throughout the relevant time period, Plaintiff attended therapy sessions with Raymond Hugger, a VA social worker specializing in PTSD therapy. Plaintiff met with Hugger sixteen times in 2005, seven times in 2006, twice in 2007, twice in 2008, and three times in 2009. During the earlier part of this period, Plaintiff's appointments were automatically scheduled for roughly every two weeks. Beginning late in 2006, Plaintiff simply called when he felt the need to schedule an appointment.

Notes from these sessions provide additional evidence of Plaintiff's conditions. At the first of these therapy sessions on April 22, 2005, based on Plaintiff's reports and his own observations, Hugger concluded that Plaintiff suffered from PTSD and major depression. Hugger observed that Plaintiff became "weepy" during the appointment, A.R. 867, expressed survival guilt, and explained that he had a flash temper with a history of fights with other men. At a 2006 appointment, Plaintiff reported stability, but complained that he suffered from some nightmares, none of which were "overwhelming emotionally." A.R. 249.

Plaintiff scheduled an appointment in August 2007 because he was struggling to cope with his father's medical decline. Plaintiff arrived to the meeting alert and oriented, but was weepy while talking about his father and complained that his nightmares had increased. In October 2007, Hugger's notes show that Plaintiff expressed "increased dreams due to helpless feeling at Dad's dementia . . . . [which] triggers memories of being helpless to assist burned man in Vietnam (Pt's trauma)." A.R. 233.

As late as January 9, 2009, Plaintiff arrived at an appointment alert and oriented, but "presented with depressed mood, slow movement and speech." A.R. 508. The two discussed Plaintiff's feelings of helplessness regarding his care for his father and connected those feelings to similar ones he experienced while in Vietnam. By the end of that appointment, "Plaintiff was brighter in affect and livelier in movements, and was formulating plans for a week's vacation in Florida with his wife." *Id*. Hugger often reported that Plaintiff was alert and oriented upon arrival for his appointments and that he benefitted from their therapy sessions by reflecting positively on his own experiences.

### e.  Sleep Studies

Additionally, throughout this time period, Plaintiff took part in neurology sleep studies for evaluations of sleep apnea and limb movements. One of these studies, which occurred on July 6, 2005, concluded that Plaintiff did not have Obstructive Sleep Apnea Syndrome, but that the results of his test were indicative of depression. At that time, the doctor overseeing the study recommended that Plaintiff visit a mental health clinic. On October 5, 2006, the diagnosis was revised to reflect that Plaintiff did suffer from a moderate case of Obstructive Sleep Apnea Syndrome.

### f.  VA Disability Determination

Based on the information before it, including Papadakis' medical opinion, notes from Sanders and Sehbi, and notes from therapy appointments with Hugger, the VA determined that Plaintiff was 20% disabled due to his diabetes and 70% disabled due to his PTSD. The VA found that Plaintiff's disability status was permanent in nature and awarded individual unemployability benefits, effective April 11, 2006. The VA stated, "Examiner opined that your PTSD is debilitating as evidenced by the GAF of 46. Since you have retired, you spend all of your time at home and are isolated.[3] You are not able to obtain and maintain gainful employment on a full time basis at the present time." A.R. 504.

### g.  Dr. Lewis

A final non-examining, non-treating source opinion is included in the record. This opinion comes from Dr. Katherine Lewis, who reviewed parts of Plaintiff's medical record on behalf of the Bureau of Disability Determination ("BDD"). After this review of Plaintiff's medical records, Lewis found that Plaintiff was not significantly limited in most of the mental

---

[3] This is not entirely accurate because Plaintiff meets at a coffee shop each morning with other veterans, helps with household chores, and attends his grandson's sporting events.

health categories but was moderately limited in the following categories: (1) understanding, remembering, and carrying out detailed instructions; (2) maintaining attention and concentration for long periods of time; (3) "[t]he ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods;" (4) responding appropriately to changes in the workplace; (5) setting realistic goals and plans without assistance from others; and (6) restriction of daily living activities. A.R. 311.

On the other hand, Lewis concluded that Plaintiff could understand and follow simple instructions, maintain concentration for simple tasks, work in a setting without time pressure or production quotas, relate to others, and adapt to job settings where the work is routine and predictable. As a result, Lewis rated Plaintiff's restriction of daily living as moderate, his difficulties in maintaining social functioning as mild, and his difficulties in maintaining concentration, persistence, or pace as moderate.

On July 11, 2008, a second BDD doctor affirmed each of Lewis' findings.

### 3.    Vocational Expert's Testimony

During the administrative hearing, an impartial vocational expert testified regarding Plaintiff's ability to obtain work. The following colloquy occurred between the vocational expert and the ALJ:

> Q.  So an individual of the claimant's age, education and work experience . . . who's limited to unskilled work, could only do the motor vehicle assembly job, is that correct?
> A.  Yes, if those are the limitations.
> Q. And if that individual was limited to low stress with no assembly line quotas they could not do the job, is that correct?
> A.  That's correct.
> Q.  Could you describe jobs that exist in the regional economy at the medium exertional level that . . . involve simple, repetitive

tasks, low stress with no assembly line production quotas and not fast paced?

A. Yes ma'am. A job such as a warehouse worker could be done. There are around 2,000 of those in the regional economy. Also . . . a floor waxer, there's around 400 of those in the regional economy. There are a total of about 120,000 medium unskilled jobs in the region. And the hypothetical you described would [INAUDIBLE] at least 40,000 of those.

Q. And how many days could an individual miss work say in an average month and still maintain competitive employment in your professional opinion?

A. About one day a month.

Q. And even though these are unskilled, low stress jobs, would an individual need to maintain focus and concentration sufficiently for them to complete whatever work they were assigned?

A. Yes, ma'am.

A.R. 63–64. Following that discussion, Plaintiff's attorney questioned the vocational expert regarding an individual's concentration and ability to interact with supervisors and coworkers:

Q. [A]ssuming the court's most restrictive hypothetical but . . . adding in the additional restriction of only superficial contact with supervisors and coworkers, would that impact your number of 40,000?

A. Yes, it would reduce it to about 10,000.

Q. And of those remaining 10,000 would the court [sic] last questions regarding absenteeism and the need to focus and concentrate still apply to those 10,000 jobs?

A. Yes.

Q. And with the concentration more specifically . . . if they couldn't concentrate more than 85 percent of the day, would that render them unable to do the job consistently?

A. When you say couldn't concentrate, are you saying would be off task?

Q. Off task, I'm sorry.

A. Fifteen percent of the time?

Q. Yes.

A. That would rule out all work.

A.R. 64–65. The vocational expert clarified his statement: "[I]f you're off task 15 percent of the time in an unskilled job, you're probably not going to maintain . . . employment for very long."

A.R. 66.

## II.

## DISCUSSION

### A.    Standard of Review

In reviewing the decision of the district court, this Court applies *de novo* review.  *Crum v. Sullivan*, 921 F.2d 642, 644 (6th Cir. 1990) ("The court of appeals reviews the district court's conclusion . . . *de novo*, and directly reviews the Secretary's findings and conclusions as if it were the first reviewing court.").  This Court reviews a decision of the Commissioner for substantial evidence.  42 U.S.C. § 405(g).  Under this standard, a reviewing court must affirm an ALJ's order where it finds "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation marks omitted).  Therefore, "[e]ven if the evidence could also support another conclusion, the decision of the [ALJ] must stand if the evidence could reasonably support the conclusion reached."  *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389–90 (6th Cir. 1999).

In reviewing an ALJ's findings and conclusions, this Court shall not "accept appellate counsel's *post hoc* rationalization for agency action in lieu of [accurate] reasons and findings enunciated by the Board."  *Hyatt Corp. v. N.L.R.B.*, 939 F.2d 361, 367 (6th Cir. 1991) (internal quotation marks omitted).  This Court has adopted the First Circuit's pronouncement on this issue: "Where a subsidiary finding is unfounded, the court will remand the case to the agency for further consideration . . . if 'the court is in substantial doubt whether the administrative agency would have made the same ultimate finding with the erroneous finding removed from the picture[.]'"  *Berryhill v. Shalala*, No. 92–5876, 4 F.3d 993, 1993 WL 361792 at *7 (6th Cir. Sept. 16, 1993) (quoting *Kurzon v. U.S. Postal Serv.*, 539 F.2d 788, 796 (1st Cir. 1976)).

Therefore, even where the ALJ's decision is based on mistakes, this Court affirms those conclusions if the mistakes constituted harmless error. *Id*.

**B.    Legal Framework**

To receive disability insurance benefits, a claimant must be deemed disabled by the Commissioner.  A claimant is disabled and entitled to benefits if he or she cannot engage in substantial gainful employment due to a physical or mental impairment that is expected to either lead to death or last longer than twelve months.  *Foster v. Bowen*, 853 F.2d 483, 486 (6th Cir. 1988) (citing 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A)).

The Commissioner employs a "five-step sequential evaluation process" to determine whether a claimant is disabled.  20 C.F.R. § 404.1520(a)(1).  First, the Commissioner determines whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(i). Next, the Commissioner considers whether the claimant meets the duration requirements set forth in 20 C.F.R. § 404.1509 and has a "severe medically determinable physical or mental impairment."  20 C.F.R. § 404.1520(a)(4)(ii).  At the third step, the Commissioner determines whether the claimant has an impairment that "meets or equals one of [the] listings in [20 C.F.R. Pt. 404, Subpt. P. App. 1] and meets the duration requirement."  20 C.F.R. § 404.1520(a)(4)(iii). If the claimant's impairments do not meet or equal any of the listed impairments in Appendix 1, the Commissioner "will assess and make a finding about [the claimant's RFC] based on all the relevant medical and other evidence in [the] case record."  20 C.F.R. §§ 404.1520(a)(4)(iv), (e). If the Commissioner determines that the claimant cannot do his or her past relevant work, then the Commissioner proceeds to the final step to consider the RFC in combination with the claimant's "age, education, and work experience to see if [the claimant] can make an adjustment to other work."  20 C.R.F. § 404.1520(a)(4)(v).

## C.    Weight of the Medical Source Opinions

An ALJ must consider all medical opinions provided in the record.    20 C.F.R. § 404.1527(c).  The opinion of an examining medical source is generally given greater weight than the opinion of a non-examining source.  20 C.F.R. § 404.1527(c)(1).  A treating medical source's opinion is given the greatest weight because "these sources are likely to be the medical professionals most able to provide a detailed longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations." 20 C.F.R. § 404.1527(c)(2).  If the ALJ finds that the treating medical source's opinion is not entitled to controlling weight, that determination must be fully explained.  SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996) [hereinafter SSR 96-2p].  In fact, the ALJ must provide reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id*.

Even if the ALJ finds that a treating source's medical opinion is not entitled to controlling weight, that opinion is not simply rejected.  Instead, "[i]t may still be entitled to deference and be adopted by the adjudicator." *Id*.  To make such a determination, an ALJ considers the examining relationship, the treatment relationship, the length of the treatment relationship, the supportability of a medical source's opinion, the consistency of the opinion with the record as a whole, the specialization of the medical source, and other relevant factors.  20 C.F.R. § 404.1527(c); SSR 06-03p, 2006 WL 2329939, at *3 (Aug. 9, 2006).  By including the existence of an examining and treating relationship in the factors determining the weight to be accorded to different medical opinions, "[t]he regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual

become weaker." *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375-76 (6th Cir. 2013) (editing in original) (quoting SSR No. 96-6p, 1996 WL 374180, at *2 (Soc. Sec. Admin. July 2, 1996)).

"A case cannot be decided in reliance on a medical opinion without some reasonable support for the opinion." SSR 96-2p, at *1. It should be noted that ALJs are not bound by findings made by state agency or other program physicians and psychologists, but they "may not ignore these opinions and must explain the weight given to these opinions in their decisions." SSR 96-6p, 1996 WL 374180, at *1 (Jul. 2, 1996).

### 1.    Weight Assigned to Dr. Papadakis' Opinion

Plaintiff asserts that the ALJ improperly accorded Papadakis' opinion little to no weight. In rejecting Papadakis' opinion, the ALJ stated the following, and only the following:

> The record contains no evidence of a treating relationship between Dr. Papadakis and the claimant. Furthermore, Dr. Papadakis' opinion was based on a one-time examination. The claimant's presentation to Dr. Papadakis was totally different than at another physical examination that same day. The only plausible explanation for his pessimistic assessment of the claimant's functional capabilities is that such assessment was based on an unquestioning acceptance of claimant's subjective complaints. Furthermore, the doctor's opinion is unsupported by other evidence, especially treatment records from the claimant's therapist. For these reasons, the opinion of Dr. Papadakis is given little, if any weight.

A.R. 23–24 (internal citation omitted). This Court reviews this analysis and conclusion to determine whether they are supported by substantial evidence.

First, the ALJ's claim that Papadakis' opinion and assignment of a GAF of 46 were based solely on an unquestioning acceptance of Plaintiff's subjective complaints is inaccurate and not supported by evidence in the record. As the notes from Papadakis' examination demonstrate, his opinion was only based in part on Plaintiff's own self-reporting regarding his conditions. In

addition to those reports, Papadakis recorded notes regarding his own observations of Plaintiff's physical symptoms and behavior. Papadakis observed that Plaintiff had difficulty walking, was sloppily dressed, and was quite tearful during the appointment, especially when discussing a friend killed in Vietnam. Papadakis observed that Plaintiff was anxious, "demonstrated above average levels of psychomotor agitation . . . was hypervigilant, suspicious, [and] looked around the room." A.R. 238.

Even if Papadakis had based his medical opinion solely on Plaintiff's own reports of hallucinations, nightmares, flashbacks, isolation, and psychological numbness, that likely would not have provided a sufficient basis for the ALJ's rejection of his medical opinion. This Court has acknowledged the difficulty inherent in proving psychological disabilities as follows:

> [A] psychiatric impairment is not as readily amenable to substantiation by objective laboratory testing as a medical impairment . . . consequently, the diagnostic techniques employed in the field of psychiatry may be somewhat less tangible than those in the field of medicine . . . . In general, mental disorders cannot be ascertained and verified as are most physical illnesses, for the mind cannot be probed by mechanical devices . . . in order to obtain objective clinical manifestations of medical illness . . . . [W]hen mental illness is the basis of a disability claim, clinical and laboratory data may consist of the diagnosis and observations of professionals trained in the field of psychopathology. The report of a psychiatrist should not be rejected simply because of the relative imprecision of the psychiatric methodology or the absence of substantial documentation, unless there are other reasons to question the diagnostic techniques.

*Blankenship v. Bowen*, 874 F.2d 1116, 1121 (6th Cir. 1989) (quoting *Poulin v. Bowen*, 817 F.2d 865, 873–74 (D.C. Cir. 1987)). In the instant case, Papadakis based his conclusions regarding Plaintiff's disability, in part, on the observed physical manifestations of Plaintiff's symptoms and, in part, on Plaintiff's self-reporting and descriptions of his own conditions. It would be impossible for a doctor to observe the contents of Plaintiff's dreams, the intensity of his

hallucinations, or his flashbacks to the Vietnam War. Instead, Papadakis had to rely on these reports, most of which have been consistent throughout the time Plaintiff sought treatment from the VA. Even until his last recorded appointments in 2009, Plaintiff reported hallucinations, flashbacks, and bad dreams to Hugger and Sehbi. Although Plaintiff's descriptions of his daily activities during this time period were not completely consistent, there is no indication in the record that Plaintiff's reports to Papadakis were inaccurate or embellished for purposes of procuring disability benefits from the VA. Additionally, Papadakis observed Plaintiff's physical symptoms, finding that he suffered from anxiety, agitation, and overwhelming emotion. Therefore, the ALJ's articulated reason for rejecting Papadakis' opinion is insufficient and not supported by the evidence in the record.

The ALJ also rejected Papadakis' opinion because Plaintiff presented differently later that same day at a physical examination following his appointment with Papadakis. This, however, is an insufficient basis for the ALJ's rejection of the medical opinion. Plaintiff *did* attend a physical examination later that day, but it was unrelated to his PTSD and was specifically focused on his heart and lungs. Although the medical examiner's notes do not mention difficulty walking, as was documented by Papadakis earlier that day, it is not evident that such a condition would have been acknowledged in the notes, as the majority of these notes are concerned with Plaintiff's heart and lungs.[4] Instead, the medical examiner noted Plaintiff's elevated heart rate, which is consistent with the anxiety observed by Papadakis.

Finally, the ALJ stated that Papadakis' opinion was inconsistent with the rest of the evidence in the record, especially treatment records from Hugger, Plaintiff's therapist. It is unclear from this statement which portions of the record are inconsistent with Papadakis'

---

[4]Perhaps, had Plaintiff walked into the appointment teary-eyed and limping, those conditions might have been documented in the notes.

opinion, but this Court reviews the record as a whole to determine whether the ALJ's decision is supported by substantial evidence. *Garner v. Heckler*, 745 F.2d 383, 388 (6th Cir. 1984).

As late as January 2009, Plaintiff's treating psychiatrist increased one of Plaintiff's depression and paranoia medications. Although Plaintiff's GAF score had increased to 50 by 2009, such a score is still indicative of serious functional impairment and is consistent with a finding of disability. The ALJ failed to mention Sehbi and Sanders, both of whom found that Plaintiff faced difficulties and was properly diagnosed with PTSD. Both of their findings from 2005 through 2009 are consistent with a finding that Plaintiff is disabled. In particular, notes from Sanders' August 2005 examination of Plaintiff was consistent with Papadakis' opinion, stating that Plaintiff had slow speech and slow spontaneous movement, his mood was depressed, and his affect was congruent, often tearing.

There is, however, some evidence in the record that Plaintiff's condition has improved. Plaintiff met less frequently with his therapist and often demonstrated improvement over the course of individual therapy sessions. Even with his serious PTSD, Plaintiff is able to interact on a weekly basis with his family, attend his grandson's sporting events, and drink coffee with a group of veterans every day. He is able to drive himself to and from the coffee shop on an almost daily basis and he drives his wife to the store, where he prefers not to interact with people and either remains in the car or sits at the front of the store while his wife shops.

Although the record contains some evidence supporting the ALJ's decision to accord Papadakis' opinion little weight, it is not clear that the ALJ would have come to the same conclusion had she not mischaracterized the record, supported her conclusion with inaccurate and improper reasoning, and ignored the opinions of Sehbi and Sanders. Therefore, without more explanation for the rejection of Papadakis' opinion and a more accurate characterization of

the record, this panel cannot find that the ALJ's rejection of Papadakis' opinion was proper and supported by substantial evidence.

**2.      Failure to Mention the Opinions of Drs. Sanders and Sehbi**

Additional grounds for remand are found in the ALJ's failure to consider the opinions of—or even mention by name—two examining physicians, Dr. Sanders and Dr. Sehbi, one of which maintained a treating relationship with Plaintiff over a period of years.

Dr. Sanders examined Plaintiff in 2005 and diagnosed him with combat related PTSD. He assigned him a GAF score of 45, reflecting serious symptoms or serious impairment, and recorded observations that support those findings, including that Plaintiff exhibited slow spontaneous movement and speech, that he was wary of noise in the hallway and positioned himself to keep an eye on the door, that Plaintiff's thoughts centered on hopelessness and his mood was depressed and teary, that Plaintiff experienced survival guilt, and that he reported auditory and visual hallucinations. Sanders concluded that Plaintiff's condition had "negative effects on work productivity, domestic relations, and quality of life" that "persist to the present time." A.R. 271.

Because Dr. Sanders' findings provide evidence tending to support disability, and moreover provide additional support for Papadakis' opinion by corroborating his observations of Plaintiffs' depressive mood, tearfulness, hypervigilance, and reported hallucinations, the ALJ's failure to consider these findings is troubling. An ALJ must consider all medical opinions provided in the record, and the opinion of an examining medical source like Sanders is generally given greater weight than the opinion of a non-examining source. 20 C.F.R. § 404.1527(c). Of course, an ALJ may depart from that general rule in light of her application of the factors set out

in § 404.1527(c), but here the ALJ gave no indication that she applied those factors to discount Sanders' findings.

On these facts, and particularly in light of Sanders' examination of Plaintiff and the consistency of his observations with other examining medical sources in the record whose opinions were ignored or discounted, the ALJ's failure to discuss Sanders' opinion in any substantive way violates the requirement that administrative agencies must explain their reasoning. *See S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196-97 (1947) (the basis for an agency decision "must be set forth with such clarity as to be understandable" in order to enable judicial review); *Hyatt Corp. v. NLRB*, 939 F.2d 361, 367 (6th Cir. 1991) (the requirement that an agency state its reasons for a decision "imposes a discipline on the agency which prevents haphazard or arbitrary administrative action").

The ALJ's failure to mention Dr. Sehbi by name or discuss his findings in any depth is even more concerning, since Sebhi treated Plaintiff from 2005 to 2009. Sehbi agreed with Plaintiff's diagnosis of PTSD, and his notes reflect Plaintiff's consistent symptoms of agitation and irritability, visual and auditory hallucinations, survival guilt, nightmares and difficulty sleeping, and a depressive and tearful affect. Sehbi assigned scores of 48, 52, 50, and 50 in 2005, 2006, 2007, and 2009. As late as January 30, 2009, notes from Sehbi's appointment with Plaintiff indicate that Plaintiff continued to have dreams and flashbacks and that he was growing increasingly depressed. At that time, Sehbi increased the dosage for one of Plaintiff's medications for depression, insomnia, and paranoia.

As an initial matter, because Sehbi's observations and opinions are consistent with the observations and opinions of both Papadakis and Sanders, and because taken together the findings of these three examining medical sources provide strong evidence of disability, the

21

ALJ's omission of any substantive discussion of Sehbi's findings deprives the Court of an adequate explanation of her findings. *See Chenery Corp.*, *supra*; *Hyatt Corp.*, *supra.*

The failure to discuss Sehbi's findings also runs contrary to the treating source rule set out at 20 C.F.R. § 404.1527(c)(2). If an ALJ finds that a treating source's opinion is well-supported and is not inconsistent with other evidence in the record, the ALJ gives it controlling weight. Even if the ALJ finds that the treating medical source's opinion is not entitled to controlling weight, that determination must be fully explained. 29 C.F.R. § 404.1527(c)(2); SSR 96-2p. "Claimants are entitled to receive good reasons for the weight accorded their treating sources independent of their substantive right to receive disability benefits." *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). The reasons provided by the ALJ must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for the weight." SSR 96-2p. "An ALJ's failure to follow [this rule] denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Cole v. Astrue*, 661 F.3d 931, 939-40 (6th Cir. 2011) (internal quotation marks omitted).

Sehbi was Plaintiff's treating psychiatrist and he evaluated Plaintiff and prescribed medications during the relevant time period, yet the ALJ almost entirely ignored his opinions and reports in the record.[5] The ALJ failed to even mention Sehbi by name and only considered some

---

[5] The instant case is distinguishable from *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 536 (6th Cir. 2001) in which this Court held that "[a]lthough the ALJ should have included a reference to the [treating doctor's] report in its findings, the failure to do so . . . was harmless error." The Court found the error harmless because the treating doctor's report was outdated and unsupported. Additionally, the ALJ had clearly considered the treating doctor's report and included some of its findings in the hypothetical question posed to the vocational expert. This case is also distinguishable from *Vance v. Comm'r of Soc. Sec.*, 260 F. App'x 801, 805 (6th Cir.

isolated excerpts from his notes. This does not satisfy the requirements set forth in this Court's case law, and this does not constitute a harmless error. Sehbi's opinions were not "so patently deficient that the Commissioner could not possibly credit [them]," and the ALJ did not adopt Sehbi's opinions or make findings consistent with them. *Cole*, 661 F.3d at 940. The most glaring inconsistent finding made by the ALJ is that Papadakis' opinion was unsupported by other evidence in the record, despite the similarities between Papadakis' and Sehbi's observations and opinions. Additionally, although three out of the four GAF scores assigned to Plaintiff by Sehbi reflected Sehbi's opinion that Plaintiff had serious symptoms or impairments, the ALJ minimized Plaintiff's symptoms and concluded that Plaintiff's impairments were either moderate or mild.[6] Although there may be evidence in the record to support the ALJ's departure from Sehbi's finding, Plaintiff was entitled to receive "good reasons" why Sehbi's opinion with regard to the "nature and severity" of his impairments were not given controlling weight. *See* 20 C.F.R. § 404.1527(c)(2). Additionally, we cannot "say that the goal of § 1527(d)(2)" was met because it is not clear that the ALJ properly considered these opinions, and it is not clear that the outcome would have been the same had the opinions been considered.

### 3. Weight Assigned to the VA's Disability Determination

A claimant may submit a broad range of evidence to prove that he or she is disabled, including decisions of governmental or non-governmental agencies about whether a claimant is disabled. 20 C.F.R. § 404.1512(b)(5). A disability determination made by another governmental

---

2008), because the ALJ in that case "did not summarily dismiss the treating physicians' opinions; rather, the ALJ provided a lengthy, accurate, and thorough discussion of [the] treating physicians' reports and findings."

[6] The GAF scores Sehbi assigned show that Plaintiff's symptoms or impairments mostly remained "serious" over the course of his treatment. He did assign a score of 52 in 2006, placing Plaintiff on the serious end of the "moderate" spectrum, but Sehbi reduced the score to 50 in 2007 and repeated the score of 50 in 2009 at their last appointment.

agency is not binding on the Administration, but it "constitutes relevant evidence within the definition of [42 U.S.C.] § 405(g)" and therefore should be considered as part of the medical records presented by a claimant. *Deloge v. Comm'r of Soc. Sec. Admin.*, 540 F. App'x 517, 518 (6th Cir. 2013).

In the instant case, the VA's disability determination was based on Papadakis' assessment, Hugger's notes, examinations by Sanders and Sehbi, and Plaintiff's various GAF scores. In according minimal weight to the VA's disability determination, the ALJ noted that the Plaintiff's GAF score had increased to 50 by January 30, 2009, which the ALJ interpreted as a sign of Plaintiff's improved condition. In rejecting the VA's disability determination, the ALJ stated,

> The statement from the VA is based on the claimant's therapist assigning the claimant a GAF score of "46" and the claimant's statements that he continues to be depressed and isolates himself. However, the claimant's GAF score rose by January 30, 2009, indicating improvement in his condition. In fact, the statement from the therapist referred to in the VA letter dated January 2007 is not credible because in 2006 the claimant and therapist agreed that the claimant no longer needed to be seen routinely and the claimant would call if he needed an appointment. This decision was based, in part, on the fact that the therapist had not seen the claimant for a year. Since that decision, the evidence shows that the claimant was seen by the therapist in August 2008, November 2008, March 2009, and October of 2009, certainly not evidence of continues [sic] severe PTSD and depression. In fact, the claimant said he had gotten better. The VA opinion is not supported by the great weight of the evidence.

A.R. 27 (internal citations omitted).

The ALJ's description of the record is incorrect and lacks support in a number of respects. First, an examining doctor and a treating psychiatrist assigned Plaintiff's GAF scores, not Plaintiff's therapist. Sehbi's assignment of a GAF score of 50 in 2009 is still indicative of

serious functional impairment, not of significantly improved mental health. Additionally, since April 2006, Plaintiff saw a psychiatrist or therapist on six additional, unaccounted-for occasions.

In rejecting the VA's disability determination, the ALJ did not explicitly consider the opinions of Sehbi and Sanders, selectively referred to notes from Plaintiff's therapy appointments with Hugger, and improperly characterized a GAF score of 50 as showing significant improvement. Some of the ALJ's conclusions rejecting the VA's disability determination are inaccurate and reflect selective characterization of the record. However, the VA's disability determination occurred in 2006, and the record shows that since that time, Plaintiff's condition has shown some improvement. Plaintiff has an increased GAF score, meets less frequently with his therapist, socializes with other veterans at a local coffee shop, and attends his grandson's sporting events. Although these factors might have been sufficient for according little weight to the VA's disability determination in the absence of the ALJ's errors, it is not clear that the ALJ's decision would have been the same without these errors and without improper consideration of the treating sources' opinions.

### 4. Weight Assigned to Dr. Lewis' Opinion

In according the non-examining state consulting psychologist's opinion great weight, the ALJ stated, "Dr. Lewis's opinion is given great weight as it is a credible estimation of the claimant's work-related mental capacity and is not inconsistent with the evidence of record or the residual functional capacity found herein." A.R. 25. On the other hand, the ALJ discredited part of Lewis' analysis that found Plaintiff was moderately limited in his ability to perform activities of daily living because the evidence, including Plaintiff's own testimony during the hearing, showed that Plaintiff was not as limited or isolated as Lewis believed.

Although the ALJ failed to articulate any reasons for elevating part of Lewis' opinion over the other opinions in the record, her opinion is consistent with the record and is not contradicted by the findings of Sehbi, Sanders, or Hugger.[7] Following a partial review of Plaintiff's medical records, Lewis acknowledged Plaintiff's treatment history and reviewed the record to gain an understanding of Plaintiff's ability to perform daily life skills. Her report accurately summarized much of Plaintiff's medical history, and there is no direct evidence in the record that contradicts Lewis' findings. As a result, the ALJ did not err in according substantial weight to Lewis' opinion.

**D.     Negative Credibility Determination**

This Court reviews an ALJ's credibility determinations for substantial evidence as well. Appellate courts generally defer to an ALJ's credibility determination because "[t]he opportunity to observe the demeanor of a witness, evaluating what is said in the light of how it is said, and considering how it fits with the rest of the evidence gathered before the person who is conducting the hearing, is invaluable, and should not be discarded lightly." *Beavers v. Sec. of Health, Ed. & Welfare*, 577 F.2d 383, 387 (6th Cir. 1978).

If the ALJ finds that a claimant has "a medically determinable impairment[] that could reasonably be expected to produce [his or her] symptoms . . . [the ALJ] must then evaluate the intensity and persistence of [those] symptoms . . . [to] determine how [the] symptoms limit [the claimant's] capacity for work." 20 C.F.R. § 416.929(c)(1). To make this determination, the ALJ

---

[7] Plaintiff asserts that the ALJ's failure to articulate particular reasons for adopting Lewis' opinion constituted legal error because "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007). In the instant case, it is difficult to say that the ALJ's failure to include a full explanation for adopting Lewis' opinion prejudiced Plaintiff on the merits or deprived him of a substantial right.

considers objective medical evidence and other evidence such as (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) precipitating and aggravating factors; (4) "[t]he type, dosage, effectiveness, and side effects of any medication;" (5) forms of treatment other than medication that the claimant receives to relieve his or her symptoms; and (6) other measures used to relieve the pain. 20 C.F.R. § 416.929(c)(3)(i)–(vi). "The claimant's credibility [regarding the intensity and persistence of symptoms] may be properly discounted to a certain degree . . . where an [ALJ] finds contradictions among the medical reports, claimant's testimony, and other evidence." *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 392 (6th Cir. 2004) (internal quotation marks omitted).

Although objective evidence exists in the record to support Plaintiff's claims regarding the intensity, persistence, and limiting effects of his own PTSD and depression, substantial evidence also exists to support the ALJ's negative credibility determination. The ALJ found that Plaintiff's statements regarding the severity of his symptoms and their limiting effects were not entirely credible. In making this determination, the ALJ compared Plaintiff's testimony regarding the severity of his symptoms to the evidence in the record. The ALJ's summary of Plaintiff's testimony regarding his ability to do social and personal activities is accurate and properly considered the frequency with which he visited doctors for treatment, the various medical sources' opinions, the treatment notes in the record, and Plaintiff's own descriptions of his PTSD and depression.

Although the ability to do household chores is not direct evidence of an ability to do gainful work, *see* 20 C.F.R. § 404.1572, "[a]n ALJ may . . . consider household and social activities engaged in by the claimant in evaluating a claimant's assertions of pain or ailments."

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 532 (6th Cir. 1997). *See also Blacha v. Sec. of Health & Human Servs.*, 927 F.2d 228, 231 (6th Cir. 1990) ("[A]n ALJ may consider household and social activities in evaluating complaints of disabling pain."). At one point during the hearing and occasionally during appointments with VA doctors, Plaintiff asserted that he isolates himself and rarely leaves his house. That statement is not an accurate characterization of Plaintiff's daily activities. In fact, Plaintiff spends a great deal of time with his family, drives or walks to the local coffee shop, meets with other veterans on a daily basis, and assists in chores around the house. Although none of these activities is direct evidence that Plaintiff is able to sustain a high level of concentration throughout the day or that Plaintiff is a social individual, they are inconsistent with Plaintiff's descriptions of isolation and an inability to concentrate.

An ALJ may also base a credibility determination on a claimant's "longitudinal medical record demonstrating an individual's attempts to seek medical treatment for pain or other symptoms and to follow that treatment once it is prescribed." SSR. 96-7p, 1996 WL 374186, at *7 (July 2, 1996). "Persistent attempts by the individual to obtain relief of pain or other symptoms . . . may be a strong indication that the symptoms are a source of distress to the individual and generally lend support to an individual's allegations of intense and persistent symptoms." *Id*. The ALJ considered Plaintiff's treatment history, acknowledging that although Plaintiff sought assistance from Sehbi and Hugger in 2009, he stopped visiting these individuals on a regular basis much earlier, only calling for appointments on an as-needed basis. Therefore, the longitudinal record does not contradict the ALJ's findings regarding the intensity of Plaintiff's symptoms.

The ALJ, not this Court, weighs the evidence and the testimony to make a credibility determination. Even if this Court were to find that evidence could support an alternative

conclusion, the panel must affirm if the credibility determination is supported by substantial evidence. In the instant case, although the ALJ was often conclusory in her analysis, her negative credibility determination is supported by substantial evidence in the record.

**E.      RFC and Hypothetical Question Posed to Vocational Expert**

An ALJ may rely on a vocational expert's response to a hypothetical question if that question was based on limitations that were properly credited by the ALJ and supported by substantial evidence in the record. *See Walton v. Comm'r of Soc. Sec.*, 60 F. App'x 603, 611 (6th Cir. 2003); *Brewer v. Soc. Sec. Admin.*, 39 F. App'x 252, 254 (6th Cir. 2002). In order for a vocational expert's testimony to constitute substantial evidence that a significant number of jobs exists in the economy, "the question[s] must accurately portray a claimant's physical and mental impairments." *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516 (6th Cir. 2010). "[T]he ALJ is only required to incorporate into the hypothetical questions those limitations that have [properly] been accepted as credible," *McIlroy v. Comm'r of Soc. Sec.*, 42 F. App'x 738, 739 (6th Cir. 2002), and "is not obligated to include unsubstantiated complaints and restrictions in his hypothetical questions," *Brewer*, 39 F. App'x at 254.

Plaintiff asserts that the ALJ's hypothetical question was insufficient to meet this standard and that his own attorney's question, which included an assessment that Plaintiff would be off-task for at least 15% of a workday and would miss more than one day of work per month, was more accurate. To support this assertion, Plaintiff cites numerous references in the record regarding his auditory and visual hallucinations, his anger and agitation, his depression, his dreams and flashbacks to the Vietnam War, his anger outbursts at his previous place of employment, and that prior to retiring, he was missing two days per week due to stress. Plaintiff cites Papadakis' opinion that Plaintiff has difficulty with memory, concentration, and attention.

He also cites to his own testimony regarding his poor concentration and inability to sleep. Plaintiff claims that "the evidence of record supports that [he] is much more limited" than the ALJ gave him credit for. Pet'r's Br. at 54.

Based on Plaintiff's claims regarding attention, ability to follow instructions, and ability to handle stress or change in the workplace, as well as the medical source opinions in the record, the ALJ first found that "the claimant experiences 'moderate' limitation in his ability to maintain concentration, persistence, or pace because the claimant shows some limitation in his ability to sustain focused attention and concentration and to independently, appropriately, and effectively complete tasks." A.R. 22. It is not clear that the ALJ incorporated those moderate limitations into the hypothetical question posed to the vocational expert or properly considered them in making a final non-disability determination. The ALJ's hypothetical question included limitations for "simple, repetitive tasks, low stress with no assembly line production quotas and not fast paced." A.R. 63. Following the initial hypothetical question, the ALJ only asked whether an individual would need to maintain focus and concentration to complete those tasks. Although the vocational expert answered that focus and concentration would be required for completion of those tasks, the ALJ appears to have ignored that response. Additionally, because the ALJ failed to properly consider the medical opinions of Sehbi, Sanders, and Papadakis, it is difficult for this Court to find that the RFC and hypothetical question were supported by substantial evidence. *See Cole*, 661 F.3d at 940 (explaining that the Court's "finding that the ALJ's decision [was] not supported by substantial evidence [was] based on the ALJ's violation of the agency's procedural rules.").

### III.

### CONCLUSION

The ALJ erred by failing to consider two treating sources' opinions or provide good reasons for rejecting those opinions. This error was not harmless, and it calls into question many of the ALJ's conclusions regarding other evidence in the record. Therefore, this Court **VACATES** the district court's judgment and **REMANDS** the case to the Commissioner for further proceedings consistent with this opinion.