NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 13a0728n.06

**No. 11-5654**

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED

*Aug 06, 2013*

DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| JACQUELINE M. BROOKS, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| COMMISSIONER OF SOCIAL SECURITY, | ) | WESTERN DISTRICT OF KENTUCKY |
| | ) | |
| Defendant-Appellee. | ) | OPINION |

**Before: COOK and STRANCH, Circuit Judges; LAWSON District Judge.**[*]

**DAVID M. LAWSON, District Judge.** In this appeal, claimant Jacqueline Brooks challenges the step-five determination by an administrative law judge that there are jobs in significant numbers in the national economy that Brooks is capable of performing, and therefore she is not disabled under the Social Security Act. The fundament of her challenge is the ALJ's treatment of evidence of Brooks's mental impairments, which, she says, were not properly assessed and considered in determining her capacity to perform work. We find that the ALJ's conclusions on this issue are not supported by substantial evidence in the administrative record. Therefore, we vacate the judgment of the district court and remand for further proceedings.

---

[*]The Honorable David M. Lawson, United States District Judge for the Eastern District of Michigan, sitting by designation.

- 1 -

I.

On July 3, 2007, Brooks filed applications for a period of disability, disability insurance benefits, and supplemental security income under Titles II and XVI of the Social Security Act. In both applications, she alleged disability beginning June 16, 2007. Her claims were denied initially on August 2, 2007, and again on reconsideration on October 19, 2007. Thereafter, at Brooks's request, an ALJ conducted a hearing on June 2, 2009, and issued an unfavorable decision on October 27, 2009. Brooks was 47 years old at the time.

Brooks testified that she quit school at age 16, dropping out after completing the tenth grade. She lived with a friend at the time of the hearing, and her daughter helped take care of her. Brooks stated that she had job training as a certified nursing assistant (CNA) and certified medical assistant (CMA). She worked as a CNA at nursing homes and on private duty from 1992 to 2000. She also worked at Dippin' Dots for four months in 2005, at Motel 6 for six months in 2004, at Subway Sandwiches for seven months in 2004, at Chemical Packing Corporation during the summer of 2003, at a restaurant called Thomas and King from April to July 2001, at McDonald's from January to October 2001, and at the Drury Inn from March 2001 to November 2003. Brooks wrote that her job at Dippin' Dots required her to work eight to twelve hours per day, five days per week; walk and stand her entire shift; and lift boxes of ice cream weighing roughly twenty pounds. She said that her work at Motel 6 required her to work eight to ten hours per day, five days per week and stand and walk her entire shift. During her employment at Subway, Brooks worked eight to fourteen hours per day, five days a week; stood and walked her entire shift; frequently lifted ten pound objects, kneeled, and crouched. She stated that her job at Chemical Packing required her to work eight to sixteen

hours per day, five days per week; walk and stand the entire time; stoop and kneel; and frequently carry objects weighing fifty pounds or more. She also indicated that several of her former jobs, including work for Dippin' Dots, Motel 6, Subway Sandwiches, Chemical Packing Corp., and McDonald's, required her to write, complete reports and use technical knowledge or skills.

Brooks explained that she became depressed after her mother died, had a bout with substance abuse, and stopped using drugs in approximately 2000, although her medical records indicated that she had used marijuana as late as June 2007. She is obese, with a medical history of bilateral knee pain and effusion, left deep vein thrombosis, hypertension, heart attack, back pain, and a complete hysterectomy. Brooks has a long history of knee pain with multiple hospital visits for effusions, inflammatory arthritis, and ligament injury. Brooks was treated for deep vein thrombosis in her left leg in February 2006, and visited the emergency room for back pain in December 2005 where she was diagnosed with moderate diffuse spondylosis and degenerative disc changes. Although no doctor had directed her to use a cane when she walks, she had been using one to get around for roughly a year before the hearing.

Brooks attended an alcohol abuse program at Four Rivers Behavioral Health in 2001 as part of a court-ordered program for individuals with drunk driving convictions. She did not seek further mental health treatment at Four Rivers until September 26, 2007, when she self-referred for depression. During her initial screening, Milfred Jones, Jr., a Marriage and Family Therapist Associate (MFTA), diagnosed Brooks with major depressive disorder, recurrent, severe, without psychotic features. Jones estimated her intelligence level to be average and assessed her with a Global Assessment of Functioning (GAF) score of 45.

Brooks visited Four Rivers on three additional occasions between November 2007 and May 2009 for depression. On December 19, 2007, Brooks told Gayle Rufli, an advanced registered nurse practitioner, that she "has chronic pain" and "can't work because of her physical problems and that makes her more depressed." Tr. 495. Rufli assessed Brooks with a GAF of 50 and prescribed antidepressant medication. On February 5, 2008, Brooks told Rufli that she "still feels depressed and doesn't feel like the medication has helped." Tr. 493. Rufli diagnosed Brooks with major depressive disorder, recurrent, severe, without psychotic features. On May 27, 2009, Brooks met with Carolyn Lay, a clinical social worker, to develop "critical coping strategies to help manage [her] condition." Tr. 612.

Brooks claims to suffer from a number of learning disabilities. Her initial application for benefits did not list a mental health limitation or learning disability, although she indicated in her pain and daily activities questionnaire that she was depressed at times. Brooks obtained a lawyer on September 24, 2007, and her reconsideration appeal alleged that she is depressed and has learning problems.

In October 2007, after Brooks's initial application for benefits had been denied, Alex Guerrero, M.D., a non-examining state agency consultant, completed a psychiatric review technique assessment. Relying on the fact that Brooks was not on medication for mental illness and had not been referred to a mental health specialist for treatment, Dr. Guerrero found that Brooks had no medically determinable mental impairments. He also noted that most of her limitations were due to physical factors.

Brooks's lawyer asked Dr. Bruce Amble to examine her; the examination took place on April 14, 2009, nearly one and one-half years after Dr. Guerrero's records review. Dr. Amble diagnosed a mood disorder with anger and depression, adult antisocial behavior, nicotine dependence, learning disorders in reading and arithmetic, and mild mental retardation. Before reaching that conclusion, Dr. Amble administered a number of tests. On three of them — the Minnesota Multiphasic Personality Inventory (MMPI), the Beck Depression Inventory, and the Beck Anxiety Inventory — Dr. Amble determined that the results were invalid. The problem with the MMPI was that "the clinical profile shows the client to respond to almost every type of psychopathology." Tr. 608. And both the Beck Depression Inventory and the Beck Anxiety Inventory results were "not considered valid and they reflect the kind of tendency on the client's part to over identify with items of psychopathology." *Ibid.*

Dr. Amble also administered the Wechsler Intelligence Scale IV test, on which Brooks scored a full scale IQ of 68, verbal comprehension IQ of 72, a perceptual reasoning IQ of 63, a working memory IQ of 80, and processing speed IQ of 81. Those results placed her "in a pattern of low normal to mild mental retardation." Tr. 609. Brooks tested at a fifth grade reading level and a third grade math level. Dr. Amble did not indicate that there would be any reason to doubt the validity of the intelligence tests.

Dr. Amble also completed a Medical Source Statement of Ability to Do Work-Related Activities. The Statement offers four levels to rank an individual's impairments: none, mild, serious, extreme. None is defined as no symptoms. Mild means symptoms that occur rarely, or if more frequently, that would "interfere with sustained performance on no more than one or two days per

month average." Serious means symptoms that "would be expected to interfere with sustained performance three to six days per month on average." Extreme means "[l]ittle or no useful ability to sustain performance due to symptoms . . . that would interfere with sustained performance more often than six days per month on average." Dr. Amble wrote that Brooks had "extreme" symptoms in dealing with the public, dealing with work stresses, functioning independently, behaving in an emotionally stable manner, demonstrating reliability, completing a normal workday and work week without interruption from psychologically based symptoms, and performing at a consistent pace without an unreasonable number of rest periods. Dr. Amble stated that Brooks had "serious-to-extreme" issues relating predictably in social situations. He said that Brooks had "serious" symptoms relating to co-workers, maintaining attention and concentration, understanding and carrying out complex job instructions, understanding and carrying out detailed but not complex job instructions, maintaining regular attendance and punctuality, and working in coordination with or proximity to others without reactive demonstrations of panic or other compensation. Dr. Amble reported that Brooks had "mild-to-serious" symptoms in using judgment, interacting with supervisors, accepting instructions and responding appropriately to criticism from supervisors without reactive demonstrations, and responding appropriately to changes in a routine work setting without reactive demonstrations. Dr. Amble wrote that Brooks had "mild" problems with following work rules, understanding and carrying out simple job instructions, and maintaining her personal appearance. The Medical Source Statement included prompts to describe any limitations and medical or clinical findings that supported the assessment, but Dr. Amble did not complete those portions of the form.

At the administrative hearing, Brooks testified that she had joint problems beginning in June 2007 that caused her legs to give out; a heart attack that required a stent to be placed; numbness in her hands; and back pain. She also testified that she could not spend more than ten minutes on her feet without becoming winded. With respect to her mental condition, Brooks testified that she had crying spells and that she was seeing a therapist at Four Rivers. She also testified that she had bad thoughts about walking into the river and that she usually laid around all day.

A vocational expert, Lowell Latto, testified that Brooks's past CNA position was heavy to medium in exertional requirements and semi-skilled, her past cashier job was light and semi-skilled, her packer job in a factory was medium in exertional requirements and unskilled, and her other jobs required light exertion and were unskilled. The ALJ presented a hypothetical question to Latto that assumed an individual who was 46 years old, had a tenth-grade education, was limited to light exertional work, could never balance, stoop, or climb ladders, ropes, or scaffolds, could only occasionally kneel or crawl, and needed to avoid fumes, odors, and hot and cold temperatures. The ALJ also asked Latto to consider an individual limited to simple, repetitive, routine tasks. Latto testified that such a person could perform Brooks's past light assembly and fast food work. Latto also testified that she could perform light exertional laundry work and surveillance system monitor work. The ALJ posed a second hypothetical adding a need to alternate between sitting and standing. The vocational expert testified that the sedentary surveillance monitor job would remain. When asked to assume the limitations described by Dr. Amble, Mr. Latto opined that there were no jobs that the claimant could perform.

On October 27, 2009, the ALJ issued an opinion finding that Brooks was not disabled under the Social Security Act. She found severe impairments consisting of "status post femoral popliteal bypass, status post myocardial infarction, cervical degenerative disc disease and knee impairment," Tr. 25, but did not find any severe mental impairments. She also found that Brooks retained the capacity to perform a limited range of light work, restricted by certain postural and environmental limitations. She severely discounted Dr. Amble's findings because "[t]he tests that revealed learning disorders were generally considered invalid"; and his "diagnoses are not supported by objective testing and are inconsistent with prior mental health treatment." Tr. 27. On the other hand, the ALJ gave great weight to the opinion of Dr. Guerrero, the state agency consulting physician, who found no mental impairment.

Brooks sought review before the Appeals Council, which denied her request for review. She then filed a complaint in the Western District of Kentucky. A magistrate judge recommended affirming the agency's decision because the plaintiff did not identify any additional significant physical or mental limitation that was not included in the hypothetical question to the vocational expert. The district court adopted the magistrate judge's recommendation over the claimant's objection without additional comment. Brooks's timely appeal followed.

II.

We "exercise[] *de novo* review of district court decisions in Social Security disability cases." *Kyle v. Comm'r of Soc. Sec.*, 609 F.3d 847, 854 (6th Cir. 2010) (citing *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009)). We must affirm the Commissioner's findings if they are supported by substantial evidence and the Commissioner employed the proper legal standard. *White*,

572 F.3d at 281 (citing 42 U.S.C. § 405(g)); *Elam ex rel. Golay v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation marks omitted); *see also Kyle*, 609 F.3d at 854 (quoting *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 604 (6th Cir. 2009)). Where the Commissioner's decision is supported by substantial evidence, it must be upheld even if the record might support a contrary conclusion. *Smith v. Sec'y of Health & Human Servs.*, 893 F.2d 106, 108 (6th Cir. 1989). However, a substantiality of evidence evaluation does not permit a selective reading of the record. "Substantiality of the evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Garner v. Heckler,* 745 F.2d 383, 388 (6th Cir. 1984) (internal citations and quotation marks omitted).

Brooks raises four main arguments: *first*, the ALJ committed reversible error at step five of the sequential analysis because the hypothetical question posed to the vocational expert did not take into account any of Brooks's mental limitations; *second*, the ALJ failed to consider all of the medically determinable and severe impairments; *third*, the residual functional capacity findings and conclusions of the ALJ are not supported by substantial evidence nor do they comply with the applicable standards; and *fourth*, she is entitled to reversal with instructions to calculate and award benefits. However, the main thrust of Brooks's arguments is that the ALJ improperly rejected the evidence of her mental limitations furnished by Dr. Amble and unreasonably relied on the opinion

of Dr. Guerrero, who never had the benefit of Dr. Amble's assessment. Those defects, Brooks insists, rendered the hypothetical question posed to the vocational expert fatally flawed.

When there is evidence of a mental impairment documented by "medically acceptable clinical and laboratory diagnostic techniques," 20 C.F.R. § 404.1508, the regulations require the ALJ to follow a "special technique" to assess the severity of the impairment, 20 C.F.R. § 404.1520a. But the ALJ did not apply the special technique in this case because she fully accepted the opinion of Dr. Guerrero, the consulting physician, and gave no weight to the findings of Dr. Amble. Brooks alleges that this was an error because Dr. Guerrero's assessment was contrary to the opinion of an examining physician and other sources, and because Dr. Guerrero did not review Brooks's mental health records from Four Rivers or her school records.

"In order to determine whether the ALJ acted properly in disagreeing with a medical source, we must first determine the medical source's classification," *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 514 (6th Cir. 2010), because "not all medical sources need be treated equally," *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). The Social Security regulations classify "acceptable medical sources into three types: nonexamining sources, nontreating (but examining) sources, and treating sources." *Smith*, 482 F.3d at 875.

Dr. Amble is a nontreating but examining source because he examined Brooks only once. *See* 20 C.F.R. § 404.1502 (defining a nontreating source as "a physician, psychologist, or other acceptable medical source who has examined [the claimant] but does not have, or did not have, an ongoing treatment relationship with [the claimant]"). Treating sources are doctors who have provided the claimant with "ongoing treatment." *Ibid.* Dr. Guerrero is a "nonexamining source,"

which is defined as a doctor "who has not examined [the claimant] but provides a medical or other opinion in [the claimant's] case." *Ibid.*

Generally, more weight is given to the medical "opinion of a source who has examined [the claimant] than to the opinion of a source who has not examined [the claimant]." 20 C.F.R. § 404.1527(c)(1); *see also Norris v. Comm'r of Soc. Sec.*, 461 F. App'x 433, 439 (6th Cir. 2012) (noting that a nonexamining source's opinion is given less deference than an examining (but not treating) source's opinion, which is given less deference than a treating source). But "[i]n appropriate circumstances, opinions from State agency medical and psychological consultants . . . may be entitled to greater weight than the opinions of treating or examining sources." SSR 96-6p, 1996 WL 374180, at *3. One such instance is where the "State agency medical or p[s]ychological consultant's opinion is based on a review of a complete case record that includes a medical report from a specialist in the individual's particular impairment which provides more detailed and comprehensive information than what was available to the individual's treating source." *Ibid.*

"The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight [the ALJ] will give that opinion." 20 C.F.R. § 404.1527(c)(3). Generally, more weight is given to opinions that are "more consistent . . . with the record as a whole," *id.* § 404.1527(c)(4), and opinions of "a specialist about medical issues related to his or her area of specialty," *id.* § 404.1527(c)(5).

When an ALJ relies on a non-examining source who "did not have the opportunity to review" later submitted medical evidence, especially when that evidence "reflects ongoing treatment," we generally require "'some indication that the ALJ at least considered these [new] facts before giving

greater weight to an opinion that is not based on a review of a complete case record.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409 (6th Cir. 2009) (quoting *Fisk v. Astrue*, 253 F. App'x 580, 585 (6th Cir. 2007)). Dr. Guerrero conducted his records review in October 2007, approximately eighteen months before Dr. Amble saw the claimant, and therefore he did not have the benefit of Dr. Amble's examination and testing. The Commissioner argues that there is ample evidence in the record to support Dr. Guerrero's opinion that Brooks did not suffer from any mental impairment — that is, that Brooks was not taking medication for mental health problems, and no physician referred her to a mental health specialist. But that argument by necessity relies on the absence of evidence made available to Dr. Guerrero. It fails to account for the evidence in the record showing signs of mental impairments. For instance, Brooks's school records (which the Commissioner contends are illegible) show that she was promoted through the seventh and eighth grades despite "no grades or credits earned." Tr. 186-88. *See Dragon v. Comm'r of Soc. Sec.*, 470 F. App'x 454, 462-63 (6th Cir. 2012) (noting that claimant's graduation from high school on an individual education plan without passing ninth grade proficiency test and being a mother were not inconsistent with low IQ score). And she was diagnosed with depression in September 2007 when she sought help at the Four Rivers facility. Moreover, we have observed that the absence of mental health treatment is not a very sound basis for concluding that no mental impairment exists. *Boulis-Gasche v. Comm'r of Soc. Sec.*, 451 F. App'x 488, 493 (6th Cir. 2011) (noting that "a claimant's failure to seek formal mental health treatment is hardly probative of whether the claimant suffers from a mental impairment and should not be a determinative factor in a credibility assessment relating to the existence of a mental impairment." (internal citations and quotation marks omitted)).

Nor do the ALJ's reasons for rejecting outright the opinions of Dr. Amble hold up well. The ALJ stated that "[m]ost of the [psychological] testing was invalid," and that his diagnoses of mood disorder, anger, depression, mild retardation, and learning disorders were "not supported by objective testing and are inconsistent with prior mental health treatment." But the ALJ did not explain why the intelligence tests, which indicated that Brooks suffers from learning disorders, were considered invalid. Although the ALJ need not give reasons for discounting an examining source's opinion, *Ealy*, 594 F.3d at 514, she nevertheless failed to record her rationale for discounting relevant medical tests suggesting Brooks's impaired mental functioning. The Commissioner suggested that the ALJ may have concluded that the invalidity of the MMPI battery of tests cast doubt on the validity of the others, but such reasoning does not appear in the ALJ's decision. Besides, Dr. Amble's determination of invalidity on one set of tests may well demonstrate a more discriminating approach to his psychological testing and support enhanced confidence in the other tests. To reach either conclusion, one must speculate. It is incumbent upon the ALJ to "explain [her] credibility determinations in [her] decision such that it 'must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248 (6th Cir. 2007) (quoting Social Security Ruling 96-7p, 1996 WL 374186, at *2); *see also Minor v. Comm'r of Soc. Sec.*, No. 12–1268, 2013 WL 264348, at *16 (6th Cir. Jan. 24, 2013) (citing *Rogers*, 486 F.3d at 248). Thus, we cannot ascertain whether the ALJ's conclusion that Brooks lacked learning deficits took into account the record as a whole. *See Hurst v. Sec'y of Health & Human*

*Servs.*, 753 F.2d 517, 519 (6th Cir. 1985) (observing that "failure to consider the record as a whole

undermines" denial of benefits."

Additionally, the ALJ's decision to reject Dr. Amble's opinion of Brooks's mood disorders

because it was not supported by objective testing is contrary to our recognition that

> a psychiatric impairment is not as readily amenable to substantiation by objective laboratory testing as a medical impairment . . . consequently, the diagnostic techniques employed in the field of psychiatry may be somewhat less tangible than those in the field of medicine . . . . In general, mental disorders cannot be ascertained and verified as are most physical illnesses, for the mind cannot be probed by mechanical devices in order to obtain objective clinical manifestations of medical illness . . . . [W]hen mental illness is the basis of a disability claim, clinical and laboratory data may consist of the diagnosis and observations of professionals trained in the field of psychopathology. The report of a psychiatrist should not be rejected simply because of the relative imprecision of the psychiatric methodology or the absence of substantial documentation, unless there are other reasons to question the diagnostic techniques.

*Blankenship v. Bowen*, 874 F.2d 1116, 1121 (6th Cir. 1989) (quoting *Poulin v. Bowen*, 817 F.2d 865,

873-74 (D.C. Cir. 1987)).

The Commissioner argues that the ALJ's failure to follow the special technique for

evaluating the nature and severity of mental impairments is harmless, citing *Rabbers v. Comm'r of

Soc. Sec.*, 582 F.3d 647 (6th Cir. 2009). He argues that the claimant has not identified any limitation

resulting from her mental impairments that was not included in the ALJ's residual functional

capacity determination. In *Rabbers*, we held that the psychiatric technique form prescribed by the

regulations was a diagnostic aid, not a procedural right vested in a claimant, and concluded that an

ALJ's failure to address the B criteria is harmless if the record contains enough information for the

reviewing court to determine whether the "claimant's mental impairment would have ultimately

satisfied the B criteria." *Id.* at 657. But the Commissioner's argument here is slightly different. He contends that even though the ALJ did not find a serious mental impairment, the inclusion of the limitation in the hypothetical question that jobs involve only simple, repetitive, routine tasks addressed the impairments that Brooks claims.

We have stated on a number of occasions that a hypothetical question posed to a vocational expert must include a "complete assessment of [the claimant's] physical and mental state and should include an accurate portrayal of her individual physical and mental impairments." *Howard v. Comm'r of Soc. Sec.,* 276 F.3d 235, 239 (6th Cir. 2002) (internal quotations marks and alterations omitted) (quoting *Varley v. Sec'y of Health & Human Servs.,* 820 F.2d 777, 779 (6th Cir. 1987)); *see also Ealy*, 594 F.3d at 516 (stating that "[i]n order for a vocational expert's testimony in response to a hypothetical question to serve as substantial evidence in support of the conclusion that a claimant can perform other work, the question must accurately portray a claimant's physical and mental impairments"); *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004) (holding that although an ALJ need not list a claimant's medical conditions, the hypothetical should provide the vocational expert with the ALJ's assessment of what the claimant "can and cannot do."). In *Ealy*, we found wanting an ALJ's hypothetical question limiting the claimant to "simple, repetitive tasks" because it did not address all of the claimant's limitations. Here, Dr. Amble found a host of limitations, and although the ALJ was not obliged to accept them if they were not supported by the evidence, to say that the "simple, repetitive, routine task" restriction could salvage the hypothetical simply asks too much of that limitation.

We conclude that the ALJ's determination that Brooks did not have a serious mental impairment is not supported by substantial evidence. The failure to address the claimant's mental impairments using the special technique prescribed by the regulations was error.

### III.

Brooks argues that she is entitled to have her case remanded to the Commissioner for an award of benefits. We disagree. The court may remand for an award of benefits only "if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." *Faucher v. Sec'y of Health & Human Servs.,* 17 F.3d 171, 176 (6th Cir. 1994) (noting that "[a] judicial award of benefits is proper only where the proof of disability is overwhelming or where the proof of disability is strong and the evidence to the contrary is lacking" (citing *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985))). In this case, the record needs further development on the question of Brooks's mental impairments, after which her residual functional capacity must be determined accurately. Therefore, we **VACATE** the judgment of the district court and **REMAND** with instructions to return the claim to the Commissioner for further proceedings consistent with this opinion.