RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 16a0020p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

───────────────

RONALD MILLER,

*Plaintiff-Appellant,*

*v.*

No. 15-1405

COMMISSIONER OF SOCIAL SECURITY,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:13-cv-11748—No. 2:13-cv-11748.

Decided and Filed:  January 29, 2016

BEFORE:  STRANCH, DONALD, LIPEZ,[*] Circuit Judges.

───────────────

**COUNSEL**

───────────────

**ON BRIEF:**  Ronald D. Glotta, GLOTTA & ASSOCIATES, P.C., Detroit, Michigan, for
Appellant.  Steven A. Budde, SOCIAL SECURITY ADMINISTRATION, Chicago, Illinois, for
Appellee.

───────────────

**OPINION**

───────────────

LIPEZ, Circuit Judge.  Claimant Ronald Miller seeks review of a denial of his application

for Social Security benefits.  On remand from the Appeals Council, an administrative law judge

(ALJ) determined that Miller was not disabled within the meaning of the Social Security Act and

───────────────

[*]The Honorable Kermit V. Lipez, Circuit Judge for the United States Court of Appeals for the First Circuit,
sitting by designation.

therefore did not qualify for benefits. Miller appealed the decision again, but the Appeals Council declined to review it. Miller sought judicial review in the district court, where Miller and the Commissioner cross-motioned for summary judgment. Accepting the magistrate judge's recommendation in part and denying it in part, the district court denied Miller's motion for summary judgment and granted the Commissioner of Social Security's motion, affirming the Commissioner's denial of benefits. Miller's timely appeal followed.

The ALJ's decision is flawed in multiple respects. Hence we cannot conclude that the decision is supported by substantial evidence. We therefore vacate the district court's ruling and remand with instructions that the case be returned to the Commissioner for further proceedings.

## I.

Because Miller's treatment record both precedes and follows his administrative proceedings, we present his treatment history and his claim's procedural trajectory together in chronological order below. We divide this chronology into sections that reflect the information contained in the record at each stage of consideration.

## A.　The Record Preceding the First ALJ Decision (2006-2008)

Miller is a single father who, before his alleged disability, held positions as a security guard, machine operator, material handler, and a night-club bouncer. In January 2006, Miller visited a hospital emergency department with an injured left knee. Miller presented with mild degenerative changes and a contusion. Immediately following the injury, Miller did not return to work as a night-club bouncer. In May 2006, Miller submitted an application for a period of disability, disability insurance benefits, and supplemental security income. Miller alleged disability based on "leg/knee/foot problems" on his left side, with an onset date of February 1, 2006.

In July 2006, Sonia Ramirez, M.D., and Mohammad Azimi, M.D., completed assessments of Miller in accordance with the Social Security benefits claim process. Dr. Ramirez examined Miller and concluded that Miller was obese and had a "[f]oot drop of the left foot, probably secondary to injury and trauma." Dr. Azimi reviewed Miller's records and

completed a physical residual functional capacity (RFC) assessment of Miller. Dr. Azimi listed diagnoses of left foot drop and obesity, and he determined that Miller could occasionally climb, balance, stoop, kneel, crouch, and crawl; stand for at least two hours and sit for at least six hours of an eight-hour day; and occasionally lift 20 pounds and frequently lift ten pounds.

Later that year, Miller attempted to return to work at the night club, but eventually, in 2007, his employer fired him because he was not able to carry out his responsibilities. Subsequently, Miller alleged disability due to depression, as well. In 2008, Miller sought treatment for depression at Southwest Counseling Solutions. There, Leslie Leemgraven, L.L.M.S.W., recommended that Miller receive a psychiatric evaluation "due to the severity of this [sic] depressive symptoms" and diagnosed Miller with a depressive disorder; adjustment disorder with depressed mood; and unspecified drug dependence, in remission. Leemgraven assigned Miller a global assessment of functioning (GAF) score of 49. David Vila, M.D., then completed a psychiatric examination of Miller, observing that Miller was "tearful and depressed." Dr. Vila diagnosed Miller with "[m]ajor [d]epression, recurrent, moderate," assigned Miller a GAF score of 50, and recommended a prescription for Paxil and Desyrel.

In December 2008, an ALJ considered Miller's claim and determined that he could perform a significant number of jobs in the national economy, and therefore he was not disabled within the meaning of the Social Security Act. Miller appealed the decision to the Appeals Council.

## B. The Appeals Council's Decision to Remand

In February 2011, the Appeals Council vacated the ALJ's 2008 decision and remanded the case for further proceedings. The Appeals Council determined that the ALJ's decision did not adequately evaluate Miller's mental impairments, in part, because a GAF scale rating of 49 "could indicate a serious impairment in social and occupational functioning."[1] The Appeals Council also found that the ALJ's conclusions about Miller's RFC—that he could "perform light work except for standing/walking for a maximum of 2 hours in an 8-hour day"—were not

---

[1]The Appeals Council determined that the ALJ's decision did not adequately evaluate Miller's mental impairments in accordance with 20 C.F.R. §§ 404.1520a, 416.920a ("Evaluation of mental impairments").

consistent with the record or with Social Security Administration rulings and regulations.[2]  The Appeals Council ordered an ALJ, on remand, to obtain a consultative mental status evaluation and a consultative medical examination of Miller, further develop the vocational evaluation, rule in accordance with SSA rulings and regulations, and obtain updated medical records.

**C.  The Remainder of the Record Preceding the Second ALJ Decision (2009-2011)**

From 2009 to 2011, Miller continued to seek treatment for his physical and mental impairments.  This treatment, along with Miller's consultative examinations ordered by the Appeals Council, make up the remainder of the record available to the ALJ who considered Miller's claim on remand.

In February 2009, Miller received a prescription for a walking cane to address his foot drop.  The record also includes monthly progress notes for Miller that span a period from December 2009 to July 2011.  The notes detail Miller's "leg pain" and "anxiety," as well as his coping methods and his children's status in school.  The identity of the evaluating source is unclear.

In February 2011, "James White, M.D.," completed a mental RFC assessment of Miller. White determined that Miller was either "moderately limited" or "markedly limited"—the most severe limitation level—in all but two of the assessment categories.  The assessment categories measure understanding and memory, sustained concentration and persistence, social interaction, and adaptation.  In his remarks, White indicated that Miller's condition required "repetition and very close supervision."  The record also reflects that, in 2010, "James White, NP," ordered laboratory testing on Miller.  Additional notes reflect treatment in 2009, 2010, and 2011 but do not clearly reflect the identity of the provider.

---

[2]The Appeals Council found that the ALJ's conclusions regarding Miller's functional capacity were not determined in accordance with 20 C.F.R. §§ 404.1545, 416.945, which outline the process for determining a claimant's residual functional capacity, and Social Security Ruling 96-8p, which defines a residual functional capacity assessment as "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis," SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996). The Appeals Council also found that the ALJ's determination of jobs in the national economy available to Miller did not comply with SSR 00-4p, which clarifies the standards for use of vocational experts.  SSR 00-4p, 2000 WL 1898704, at *1 (Dec. 4, 2000).

In March 2011, and in accordance with the Appeals Council's order, Miller underwent two consultative examinations—one from internal medicine physician Ernesto Bedia, M.D., and another from psychiatrist Luzbella Imasa, M.D.  Dr. Bedia diagnosed Miller with left foot drop, hypertension, and type 2 diabetes.  Dr. Bedia reported that Miller was "[a]mbulatory with a cane," but that he could "walk without the cane."  Dr. Bedia also noted that Miller had "difficulty walking on his toes and heels on the left" and was obese.  Dr. Bedia completed a medical source statement detailing Miller's ability to perform work-related activities.  Dr. Bedia determined that Miller could stand for four hours without interruption and for six hours, with breaks, in an eight-hour workday, and that Miller could frequently use both his right foot and his left foot.  Psychiatrist Imasa recorded that Miller sees a therapist and that his primary care physician prescribes antidepressants and hypertension medication.  Dr. Imasa indicated that Miller needed "therapeutic intervention and support services," but also that he was able to manage funds.  Dr. Imasa diagnosed Miller with "[m]ajor depressive disorder and [a] history of poly substance dependence in remission" and assigned Miller a GAF score of 50.  In a mental medical source statement, Dr. Imasa also indicated that Miller had no restrictions interacting appropriately with the public, supervisors, or co-workers, but that he had a marked restriction responding "appropriately to usual work situations and to changes in a routine work setting."  Dr. Imasa attributed this limitation to Miller's physical impairments.

In July 2011, Karen Jordan, M.S.W., completed a mental RFC assessment of Miller. Jordan determined that Miller was either moderately limited or markedly limited in approximately two-thirds of the assessment categories and that he was either not significantly limited or exhibited no evidence of a limitation in the remaining categories.

**D.  The 2011 ALJ Hearing and Decision**

In August 2011, Miller attended a hearing before a second ALJ to re-consider his claim for benefits.  At the hearing, Miller testified that he lives with his two young children,[3] who assist with household chores such as vacuuming and doing the laundry; that he helps his children with their kindergarten and first-grade homework; and that every Sunday, he and his children

---

[3]Although Miller's 2011 testimony indicated that he lives alone with his two children, Miller did, at some point, also live with his mother, according to the 2008 notes of Leslie Leemgraven, L.L.M.S.W.

take the church-provided bus to attend services. Miller testified that his brother gave him a car so he could drive his kids to school, because "everybody knew I was in pain walking the kids back and forth to school." Miller also testified that standing for 45 minutes caused him back and leg pain and that, with regard to his depression, he often finds himself crying and takes medication to treat his depression. Miller said that he does not stay in close touch with members of his family, other than his mother and children, and that he does not have contact with friends.

A vocational expert (VE) also testified at the 2011 hearing and provided estimates of the available jobs for a hypothetical individual with impairments consistent with those claimed by Miller. The ALJ asked the VE if an unskilled worker who could walk, stand, and sit up to six hours in an eight-hour workday, and had various other limitations, could perform any work similar to Miller's past work. Miller's attorney objected to the hypothetical as one unsupported by the record. Nevertheless, the VE said such an individual would not be able to perform any of Miller's past work and would only be able to work as a hand packager. The ALJ then adjusted the hypothetical in a variety of ways, including limiting the individual's ability to walk to two hours (assuming the individual could still stand and sit for six hours), decreasing the exertion level, and requiring the individual's use of a cane to ambulate. The VE testified that such restrictions would reduce the pool of jobs available. Finally, the ALJ asked the VE if there were any jobs available for an individual with "frequent episodes of pain, depression, memory deficits, and a combination of other impairments . . . and [who] could not sit, stand, and/or walk a total of eight hours/five days a week on a regular and continuing basis." The VE testified that such a profile "would be preclusive of employment."

Following the hearing, the ALJ determined that Miller was not disabled and did not qualify for benefits under the Social Security Act because Miller could perform a significant number of jobs in the economy. The ALJ found that Miller had the following severe impairments: "left foot drop, degenerative joint disease, hypertension, non-insulin-dependent diabetes, obesity, a history of polysubstance dependence, and depression." However, when determining Miller's residual functional capacity, the ALJ assigned "limited weight" to all but

one of Miller's medical assessments.[4]  The only opinion to which the ALJ assigned "significant weight" was that of Dr. Azimi.  Dr. Azimi's July 2006 non-examining physical RFC found that Miller could carry out a number of activities, including occasionally lifting 20 pounds, unlimited pushing and pulling, sitting for six hours, and standing/walking for two hours of an eight-hour day.  Dr. Azimi's assessment of Miller's postural limitations found that Miller could occasionally climb, balance, stoop, kneel, crouch, and crawl.  The ALJ viewed Miller's postural limitations as "slightly more restricted" than articulated by Dr. Azimi.

The ALJ assigned limited weight to Dr. Bedia's physical consultative examination, which found that Miller could stand for six hours in an eight-hour workday, because the ALJ favorably determined that Miller was "more restricted" than reflected in Dr. Bedia's assessment.  However, the ALJ attributed only limited weight to the 2008 GAF scores of 49 and 50, assigned respectively by Leemgraven, L.L.M.S.W., and Dr. Vila.  A GAF score of 41–50 "reflects the assessor's opinion that the subject has serious symptoms *or* serious impairment of social or occupational functioning."  *Keeton v. Comm'r of Soc. Sec.*, 583 F. App'x 515, 520 n.2 (6th Cir. 2014) (quoting *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 511 (6th Cir. 2006)).  The ALJ explained that she assigned limited weight to the scores because the scores were "not proportionate" with Miller's testimony that he "takes his children to school, he socializes with family and friends, and . . . he attends church on Sunday and Wednesday."

The ALJ provided similar reasoning for giving limited weight to Dr. Imasa's March 2011 GAF assessment of 50, Dr. James White's 2011 mental RFC assessment, and Social Worker Karen Jordan's 2011 mental RFC assessment.  The ALJ also assigned limited weight to Jordan's assessment because she was not a licensed psychiatrist or psychologist.  As a result, the ALJ determined that, although Miller could not perform any of his past work, he had the residual functional capacity to perform light work, he could stand and sit up to six hours, and he could

---

[4]An ALJ must "evaluate every medical opinion" she receives.  20 C.F.R. § 404.1527(c).  Under the "treating physician rule," an ALJ must accord a treating source's opinion controlling weight if the opinion is well-supported and consistent with the record as a whole.  *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009).  If an ALJ does not give controlling weight to a treating source's opinion, when weighing all other opinions—i.e., non-treating source opinions—the ALJ must consider several factors when deciding the weight to assign to a medical opinion.  *See* 20 C.F.R. § 404.1527(c).  These factors include the length and nature of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the entire record, and the specialization of the opining source.  *Id.* at §§ 404.1527(c)(1)–(6).

walk up to two hours.  Based on the VE's testimony, the ALJ determined that Miller could perform jobs that exist in significant numbers in the national economy, such as an office helper or a locker room attendant, and therefore found him "not disabled."

### E.  Post-2011 Treatment & Proceedings

Following the second ALJ's denial of his claim, Miller received additional treatment from November 2011 through December 2012.  In March 2013, the Appeals Council denied Miller's request for review of the ALJ's 2011 decision.  Subsequently, Miller sought judicial review in district court.  In 2015, the magistrate judge recommended that the district court deny the Commissioner's motion for summary judgment and grant in part Miller's motion for summary judgment to clarify James White's credentials and reassess White's opinions accordingly.[5]  The district court departed from the recommendation, however, and denied Miller's motion for summary judgment in its entirety.  The district court instead granted the Commissioner's motion, finding that the ALJ's decision was supported by substantial evidence.

**II.**

Miller argues that the ALJ violated Social Security Administration rulings and regulations when denying his claim for benefits and that the ALJ's decision was not supported by substantial evidence.  With regard to Miller's physical impairments, Miller argues that the ALJ's reliance on Dr. Azimi's opinion is not supported by substantial evidence, and the ALJ violated Social Security rulings and regulations when she failed to adequately account for all of Miller's impairments, particularly his obesity.  Miller also argues that the ALJ's determinations concerning Miller's mental impairments are not supported by substantial evidence and that the ALJ violated Social Security rulings and regulations when she discounted Miller's consistently low GAF scores.  In addition, Miller claims that the district court improperly introduced additional evidence concerning the credentials of James White and erred when determining that Miller had not established good cause to introduce new evidence about his most recent medical treatment.

---

[5]As we discuss *infra*, the record is unclear as to whether James White, M.D., and James White, N.P., are the same person and whether treatment notes in the record may be attributed to either.  This determination informs whether James White is a treating source and whether the ALJ must weigh his opinion accordingly.

## A.  Standard of Review

In Social Security cases, we review the district court's decision de novo.  *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014).  Our review of an ALJ's decision as to whether the claimant is disabled is "limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence."  *Blakley*, 581 F.3d at 405–06.  Substantial evidence requires "more than a mere scintilla" but less than a preponderance; substantial evidence is such "relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001); *accord Gentry*, 741 F.3d at 722.  Where, however, an ALJ fails to follow agency rules and regulations, we find a lack of substantial evidence, "even where the conclusion of the ALJ may be justified based upon the record."  *Gentry*, 741 F.3d at 722 (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)).

## B.  Physical Impairments

### 1.  Dr. Azimi

The ALJ afforded "significant weight" to Dr. Azimi's July 2006 RFC assessment that Miller could, among other things, "stand and/or walk for a total of at least two hours in an 8-hour workday, [and] sit for a total of about six hours in an 8-hour workday."  The ALJ found, however, that Miller was more restricted than Dr. Azimi's assessment indicated with regard to postural limitations—Dr. Azimi found that Miller could "occasionally" climb, balance, stoop, kneel, crouch, and crawl.

Dr. Azimi did not examine Miller before completing the RFC assessment.  Social Security regulations specify that "[g]enerally," the ALJ assigns "more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you."  20 C.F.R. § 404.1527(c)(1).  The ALJ clearly did not do so here, when she assigned the most weight—in fact, the *only* grant of "significant weight"—to an opinion from Dr. Azimi, a non-treating, non-examining state agency medical consultant.  To be sure, state agency medical consultants, such as Dr. Azimi, are "highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security]

Act." SSR 96-6p, 1996 WL 374180, at *2 (July 2, 1996). Thus, under certain circumstances, an ALJ may assign greater weight to a state agency consultant's opinion than to that of a treating or examining source. *See id.*, at *3; *see also Blakley*, 581 F.3d at 409. Such circumstances include where the non-examining source's opinion "is based on a review of a complete case record." SSR 96-6p, 1996 WL 374180, at *3.

However, that is not the case here. Although the Commissioner explains that Dr. Azimi cited Miller's January 2006 x-ray results and Dr. Ramirez's 2006 examination findings to support his conclusions, Dr. Azimi's RFC preceded Miller's post-2006 treatment and could not account for subsequent assessments. *See Blakley*, 581 F.3d at 409 (finding that non-examining sources offered their opinions prior to subsequent assessments from treating sources and therefore did not evaluate the complete case record). Where the non-examining source did not review a complete case record, "we require some indication that the ALJ at least considered these facts before giving greater weight to an opinion" from the non-examining source. *Id.* (quoting *Fisk v. Astrue*, 253 F. App'x 580, 585 (6th Cir. 2007)). The ALJ gave no such indication here and thus did not provide a sufficient explanation for assigning significant weight to a non-examining source's opinion. *See id.*; *see also* 20 C.F.R. § 404.1527(c).

Stranger yet, despite the ALJ's assignment of significant weight to Dr. Azimi's opinion, the ALJ found that Miller had a residual functional capacity allowing him to "stand up to six hours" in an eight-hour workday—exceeding Dr. Azimi's assessment that Miller could stand "at least two hours." In fact, the ALJ's determination that Miller could stand for six hours was consistent with *Dr. Bedia's* opinion, to which the ALJ assigned only limited weight because "the claimant is *more restricted*." (emphasis added.) Thus, the ALJ's determination concerning Miller's residual functional capacity (particularly his ability to stand) does not comport with her own determination that Dr. Azimi's assessment should be accorded significant weight.

## 2. Obesity

Miller claims that the ALJ did not consider his obesity in combination with his other impairments. Social Security Ruling 02-1p requires an ALJ to consider obesity at steps two

through five of the sequential evaluation process used to determine if an individual is disabled.**6** SSR 02-1p, 2002 WL 34686281, at *3 (Sept. 12, 2002). The ruling "'does not mandate a particular mode of analysis,'" but it "directs an ALJ to consider the claimant's obesity, in combination with other impairments, at all stages of the sequential evaluation." *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 577 (6th Cir. 2009) (quoting *Bledsoe v. Barnhart*, 165 F. App'x 408, 411–12 (6th Cir. 2006)). The ALJ satisfies this requirement so long as she credits "RFCs from physicians who explicitly accounted for [the claimant's] obesity." *Coldiron v. Comm'r of Soc. Sec.*, 391 F. App'x 435, 443 (6th Cir. 2010); *but see Shilo v. Comm'r of Soc. Sec.*, 600 F. App'x 956, 959 (6th Cir. 2015) (holding that obesity "must be considered throughout the ALJ's determinations, 'including when assessing an individual's residual functional capacity'" (quoting SSR 02-1P, 2002 WL 34686281, at *1)).

At step two, the ALJ took specific care to consider Miller's obesity and determined that Miller's severe impairments cause "more than minimal functional limitations." The Commissioner argues that although the ALJ's discussion of obesity ended at step two, the ALJ satisfied the requirement to consider obesity at all stages because she relied on a medical opinion that acknowledged Miller's obesity when she gave significant weight to Dr. Azimi's RFC. *See Coldiron*, 391 F. App'x at 443. As discussed above, however, we question the basis for assigning significant weight to the non-examining opinion of Dr. Azimi. Moreover, the ALJ's findings with regard to Miller's residual functional capacity did not directly correspond with the weight that she assigned to Dr. Azimi's assessments. This leaves us unable to determine whether and to what extent the ALJ considered other parts of Dr. Azimi's opinion—particularly the assessment of Miller's obesity—when determining his functional capacity.

---

**6**The ALJ must engage in a five-step sequential evaluation process to determine whether a claimant is disabled. *See* 20 C.F.R. § 404.1520(a)(4). At step one, the ALJ must determine whether the claimant is engaging in substantial gainful activity; if the claimant is performing substantial gainful activity, then the claimant is not disabled. *Id.* At step two, the ALJ must determine whether the claimant has a medically determinable impairment or combination of impairments that is "severe." *Id.* If the claimant does not have a severe impairment or combination of impairments, then the claimant is not disabled. *Id.* At step three, the ALJ must determine whether the claimant's impairment meets an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.* If the claimant's impairment meets or equals one of the listings, then the ALJ will find the claimant disabled. *Id.* Otherwise, the ALJ will proceed to the fourth step, where the ALJ must assess the claimant's residual functional capacity and past work. *Id.* If the claimant can still perform his or her past relevant work, the claimant is not disabled. *Id.* If the claimant cannot perform past relevant work, the ALJ must determine whether the claimant can make an adjustment to other work at step five. *Id.* If the claimant cannot make the adjustment, the ALJ will find the claimant disabled. *Id.*

The ALJ's limited discussion of Miller's obesity arguably does not comply with SSR 02-1p and certainly casts additional doubt upon whether there exists substantial evidence to support the ALJ's finding that Miller is not disabled.

## C. Mental Impairments

Miller argues that when the ALJ assigned limited weight to his global assessment of functioning (GAF) scores, the ALJ ignored the Appeals Council's order, incorrectly interpreted Miller's testimony, and incorrectly applied Social Security Ruling 96-8p. A GAF score is a "subjective rating of an individual's overall psychological functioning," which may assist an ALJ in assessing a claimant's mental RFC. *Kennedy v. Astrue*, 247 F. App'x 761, 766 (6th Cir. 2007). GAF scores are "not raw medical data," *id.*, and "the Commissioner has declined to endorse the [GAF] score for use in" Social Security benefits programs, *Lee v. Comm'r of Soc. Sec.*, 529 F. App'x 706, 716 (6th Cir. 2013) (quoting *DeBoard v. Comm'r of Soc. Sec.*, 211 F. App'x 411 (6th Cir. 2006)). In spite of this assertion, the Appeals Council referenced Miller's scores of 49 and 50 and their possible implications when it remanded his claim to a second ALJ. Thus, although a GAF score is "not essential to the RFC's accuracy," it nevertheless "may be of considerable help to the ALJ in formulating the RFC." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002).

We take a case-by-case approach to the value of GAF scores. Previously, we have refused to find that a low GAF score established that the ALJ's decision was not supported by substantial evidence where the ALJ had reason to doubt the credibility of the assigning source; the claimant had conflicting GAF scores; the GAF scores were not accompanied by a suggestion that the claimant could not perform any work; substantial evidence supported the conclusion that the claimant was not disabled; and the VE testified that an individual with the claimant's limitations could still perform a number of jobs. *See Kornecky*, 167 F. App'x 496, 511 (6th Cir. 2006). On the other hand, we have looked to consistency among low GAF scores to determine that an ALJ minimized the severity of a claimant's symptoms and failed to provide good reasons for assigning limited weight to a treating doctor's opinion. *See Keeton*, 583 F. App'x at 529–30, 530 n.6. We have also looked to the inconsistency between one doctor's assigned GAF score

and a different doctor's opinion as a proper basis for rejecting the latter doctor's opinion. *See Gribbins v. Comm'r of Soc. Sec. Admin.*, 37 F. App'x 777, 779 (6th Cir. 2002).

Miller received GAF scores from three sources: Leslie Leemgraven, L.L.M.S.W., Dr. David Vila, and Dr. Luzbella Imasa. All three sources assigned Miller a GAF score of 49 or 50. A GAF score of 41-50 "reflects the assessor's opinion that the subject has serious symptoms *or* serious impairment of social or occupational functioning." *Keeton*, 583 F. App'x at 520 n.2 (quoting *Kornecky*, 167 F. App'x at 511). The Appeals Council, when remanding Miller's case to an ALJ, noted that the GAF score of 49, assigned by Leemgraven, "could indicate a serious impairment in social and occupational functioning," and the evidence did not support the ALJ's 2008 finding that Miller's depression will improve with treatment. The Appeals Council ordered a subsequent mental consultative examination; Dr. Imasa conducted the examination and assigned Miller a GAF score of 50.

When determining how much weight to assign the opinion of a non-treating source, such as Leemgraven, Vila,[7] and Imasa, "the ALJ should consider factors including the length and nature of the treatment relationship, the evidence that the physician offered in support of her opinion, how consistent the opinion is with the record as a whole, and whether the physician was practicing in her specialty." *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 514 (6th Cir. 2010) (citing 20 C.F.R. § 404.1527(c)). Unless an ALJ assigns controlling weight to a treating physician's opinion, the ALJ must consider "all" of the above factors "in deciding the weight [the ALJ] give[s] to any medical opinion." 20 C.F.R. § 404.1527(c); *see also id.* at § 404.1527(e)(2)(ii). On remand, the ALJ assigned limited weight to all three consistent GAF scores because they were "not proportionate with the recitation of the claimant's activities and social functioning."[8] To support these decisions, the ALJ explained that Miller "testified that he

---

[7]Miller argues that psychiatrist David Vila, M.D., is a treating source, whose opinion is entitled to controlling weight. *See supra* note 4. A "treating source" provides treatment to the claimant on an ongoing basis. *See* 20 C.F.R. § 404.1502. However, the record reflects that Dr. Vila treated Miller only once, and "a single visit does not constitute an ongoing treatment relationship." *Kornecky*, 167 F. App'x at 506. Therefore, the ALJ did not err when she did not consider Dr. Vila as a treating source.

[8]The ALJ did not discuss a separate assignment of weight to the non-GAF portions of Leemgraven, Vila, or Imasa's assessments. However, the non-GAF portion of Dr. Imasa's opinion, in particular, discusses Miller's ability to interact with the public, supervisors, and co-workers, and the ALJ appears to have incorporated that non-GAF portion of the opinion into her determination that Miller could perform work "with occasional contact with the

takes his children to school, he socializes with family and friends, and . . . he attends church on Sunday and Wednesday."

Miller's 2011 hearing testimony is not consistent with this finding. Although Miller testified that he now drives his children to school, he did not testify that he socializes with family and friends. While he maintains some degree of contact with siblings, Miller explicitly said, when asked if he stayed in touch with friends, "No. I have -- all of my old friends are still doing some of the old things that people do and I have children and I have respect for my household and my lifestyle." Furthermore, Miller testified that he and his children go to church on Sunday—not Sunday *and* Wednesday—and that the church bus picks them up.

Miller's 2006 self-completed function report did, however, mention that he went "to church on Sunday and Wendsday [sic] when stress and pain isn[']t overw[h]elming." He also indicated on the form that that he read "a lot," sometimes watched television and listened to music, that "family and friends visit," but that he did not take part in any social activities since his injuries. The ALJ's reliance on choice excerpts from Miller's five-year-old function report— much of which is superseded by his 2011 hearing testimony—to discount three consistent and contemporaneous assessments of Miller's functional capacity is misplaced and not consistent with the record as a whole. *See* 20 C.F.R. § 404.1527(c)(4). The limited weight assigned does not account for consistency among the examining sources and the record as a whole, nor does it reflect consideration of the remaining required factors discussed above. *Cf. Blankenship v. Comm'r of Soc. Sec.*, No. 14-2464, 2015 WL 5040223, at *7 (6th Cir. 2015) ("[T]he regulations dictate that 'the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.'" (quoting 20 C.F.R. § 404.1527(c)(4)).

Miller adds that to the extent the ALJ relied on testimony (regarding his social activity and ability to care for his children) to assign limited weight to the GAF scores and conclude that

general public, coworkers, and supervisors." While we may look to any evidence in the record to determine whether the ALJ's decision was supported by substantial evidence, *Engebrecht v. Comm'r of Soc. Sec.*, 572 F. App'x 392, 396 (6th Cir. 2014), we cannot engage in a meaningful review of the ALJ's decision to support her findings with an opinion to which she has not assigned any weight—aside from giving limited weight to the separate GAF portion of the opinion. *See* 20 U.S.C. § 404.1527(c); *id.* at § 404.1527(e)(2)(ii) ("Unless a treating source's opinion is given controlling weight," the ALJ "must explain in the decision the weight given to . . . any opinions from treating sources, nontreating sources, and other nonexamining sources."); *see also Brooks v. Comm'r of Soc. Sec.*, 531 F. App'x 636, 643 (6th Cir. 2013).

Miller has the functional capacity to perform work, the ALJ did not follow Social Security Ruling 96-8p. SSR 96-8p defines an RFC as "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p, 1996 WL 374184, at *1. "A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." *Id.*; *see also* 20 C.F.R. § 404.1520a(c)(2) ("We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis."). Although the ALJ may properly consider Miller's household and social activities when "evaluating a claimant's assertions of pain or ailments," *Keeton*, 583 F. App'x at 532 (quoting *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 532 (6th Cir. 1997)), the ALJ must establish that Miller could have performed such activities on a "*sustained basis*" when assessing Miller's mental impairments, *see Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 377 (6th Cir. 2013). In *Keeton*, the court noted that the claimant "spends a great deal of time with his family, drives or walks to the local coffee shop, meets with other veterans on a daily basis, and assists in chores around the house." 583 F. App'x at 532. Miller, however, has no such daily, sustained social interactions, and relies on his small children and mother to take care of the home. Miller's activities are more in line with the claimant in *Gayheart*, who was able to accompany his wife on shopping trips once a month and was able to drive. 710 F.3d at 377. In *Gayheart*, we held that the ALJ had not sufficiently established that such activities allowed the claimant to function independently on a sustained basis. *Id.* at 377–78.

Similarly, we conclude that the ALJ's focus on isolated, often stale, portions of the record (1) does not offset the record's consistency with regard to Miller's assigned GAF scores and (2) is an insufficient basis to determine that Miller could conduct work activities on a sustained basis, especially in light of the Appeals Council's original decision to remand for failure to adequately evaluate Miller's mental impairments.[9]

---

[9]With respect to the ALJ's assessment of his mental impairments, Miller also argues that the ALJ erred when she discounted Social Worker Jordan's mental RFC assessment of Miller, in part, because Jordan "is not a licensed psychiatrist or psychologist." Miller argues that Jordan is a "psychotherapist," whose opinion should be accorded significant weight as an "acceptable medical source." However, Miller simply identifies Karen Jordan's

## D. New Evidence

### 1. Post-September 2011 Treatment Records

Miller seeks consideration of treatment notes and records completed after the ALJ's September 2011 decision. However, "evidence submitted to the Appeals Council after the ALJ's decision cannot be considered part of the record for purposes of substantial evidence review." *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Miller argues that the district court should have considered the post-September 2011 treatment notes because the district court was willing to introduce its own sources from outside the record to evaluate the separate question of whether James White was an acceptable medical source. This tit-for-tat line of reasoning is unavailing. The district court simply was not in the position to consider new evidence in "deciding whether to uphold, modify, or reverse the ALJ's decision." *Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996).

However, consideration of new evidence may be appropriate on remand if the claimant can show that the new evidence "is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g); *see also Foster*, 279 F.3d at 357 (stating that the claimant bears the burden of showing that remand is appropriate). Miller argues that the evidence was "not available at the time of the original hearing," but he fails to establish materiality. New evidence is material "only if there is 'a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence.'" *Foster*, 279 F.3d at 357 (quoting *Sizemore v. Sec'y of Health & Human Servs.*, 865 F.2d 709, 711 (6th Cir. 1988)). Miller's only statement to this effect is that "[t]he material subsequent to the ALJ's decision merely confirmed the invalidity of the ALJ's decision." Without more, this statement does not establish that the new evidence was sufficiently material to require remand, and we therefore agree with the district court's conclusion that Miller failed to demonstrate that remand was appropriate on that basis.

---

credentials as "MSW," and he furnishes no support for the proposition that Jordan meets the definition of a "licensed or certified psychologist." *See* SSR 06-03, 2006 WL 2329939, at *1 (Aug. 9, 2006). According to Social Security Ruling 06-03p, even a licensed clinical social worker is "not an 'acceptable medical source,'" and this designation may "justify" giving an opinion of an acceptable medical source greater weight. *Id.* at *2, *5. Thus, SSR 06-03p does not support Miller's conclusion that Karen Jordan is an acceptable medical source whose opinion is owed deferential weight.

**2. James White**

Miller argues that the district court "utilized the internet to establish additional evidence" regarding James White's credentials as an M.D., Ph.D., and/or N.P.  The magistrate judge recommended that the matter be remanded for clarification as to the identity of James White and for reassessment of White's opinion based on that clarification.  The district court declined to adopt the magistrate judge's recommendation concerning the identity of James White, and instead found that "[a] simple check of licensed health professionals on the State of Michigan, Department of Licensing and Regulatory Affairs website," identified that James White, Jr. held a nurse practitioner license and an expired and surrendered limited psychology license.

When a court undertakes review of agency action, "consideration of evidence outside the administrative record is proper under some circumstances, *e.g.*, 'for background information . . . or for the limited purposes of ascertaining whether the agency considered all the relevant factors or fully explicated its course of conduct or grounds of decision.'" *Norwich Eaton Pharms., Inc. v. Bowen*, 808 F.2d 486, 489 (6th Cir. 1987) (alteration in original) (quoting *Asarco, Inc. v. EPA*, 616 F.2d 1153, 1160 (9th Cir. 1980)).  However, we have cautioned that "the reviewing court 'must be careful not to allow such evidence to change the character of the hearing from one of review to a trial de novo.'" *United States v. Akzo Coatings of Am., Inc.*, 949 F.2d 1409, 1428 (6th Cir. 1991) (quoting *Town of Burlington v. Dep't of Educ.*, 736 F.2d 773, 791 (1st Cir. 1984)).

The determination of James White's credentials extends beyond the examples cited in *Norwich*.  Further, in *Norwich*, the court did not use any evidence from beyond the administrative record in reaching its decision.  *See Norwich*, 808 F.2d at 489.  The same cannot be said here, where the information that the district court introduced about James White formed the basis for the court's conclusion that James White was not a treating medical source and the ALJ appropriately assigned his opinion limited weight.  We therefore decline to accept the district court's decision to introduce evidence outside of the administrative record and base its

conclusion upon this evidence.[10] We share the magistrate judge's conclusion, and, on remand, the ALJ should (1) ask the parties to submit evidence that would permit the ALJ to clarify the identity or identities of James White, and (2) reassess James White's opinion(s) in accordance with that determination.

## III.

Although the ALJ's decision was thorough and thoughtful, the decision's misperceptions of the record and failure to properly follow relevant Social Security rulings and regulations prevent us from concluding that the ALJ's decision is supported by substantial evidence. Nevertheless, the record does not allow us to conclude that the claimant is affirmatively entitled to an award of benefits, despite the prolonged nature of these proceedings. We therefore VACATE the judgment of the district court with instructions to REMAND to the Commissioner for further proceedings consistent with this opinion.

So ordered.

---

[10]The district court did not clearly identify its finding with regard to James White's credentials as a matter of judicial notice, and we therefore forego an analysis of the applicability of Federal Rule of Evidence 201, which governs judicial notice, to appellate review of administrative decisions. In any event, we question whether this would be an appropriate circumstance for judicial notice given the commonality of the name "James White."